THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY
v. P. M. HOLMES,

(Filed February 13, 1907.)

1.  INTERSTATE COMMERCE—Contracts—Shipping Rates. Where
    a rate agreed upon between a station agent and a shipper for
    an interstate shipment was for less than the published tariff
    rate, but the published rate was demanded and collected at the
    destination, the difference between the rate agreed upon and the
    published tariff cannot be recovered in an action by the shipper.

2.  CONTRACTS—Illegal—Remedies. No action can be founded upon
    a contract that is forbidden by law; and where an illegal con-
    tract has been executed, in whole or in part, by the payment
    of money, the court will not lend its aid to one of the parties
    to such illegal transaction to recover it back.

(Syllabus by the Court.)

*Error from the District Court of Oklahoma County; before
B. F. Burwell, Trial Judge.*

*Henry E. Asp, Charles H. Woods, and Geo. M. Green,*
for plaintiff in error.

*M. Fulton,* for defendant in error.

STATEMENT OF FACTS.

This was an action brought by P. M. Holmes, defend-
ant in error, against the Atchison, Topeka & Santa Fe Railway
Company, to recover the sum of $44.30, claimed to be due for
an alleged overcharge of freight on a car of potatoes from
Jewell City, Kansas to Edmond, Oklahoma. The cause was

brought in the justice court, judgment was had for the plaintiff, and the defendant appealed. In the district court the case was tried upon the following agreed statement of facts:

"AGREED STATEMENT OF FACTS.

"It is agreed by the parties hereto that the court may consider the following statements as the facts in this case, and from them may make conclusions of law, and render judgment herein. Either party reserving the right to except to said conclusions of law, and judgment, and have the right to an appeal to the supreme court of this territory, the same as though this case was tried by a jury.

"No. 1. On November 1st, 1899, Alonzo McKinley was station agent for defendant company at Edmond, Oklahoma.

"No. 2 On said date said McKinley as such agent told plaintiff that the rate on a car of potatoes from Jewell City, Kansas, to Edmond, Oklahoma, of 30000 pounds weight, if shipped during the month of November, 1899, would be 29 cents per 100 pounds.

"No. 3. That relying on said statement the plaintiff purchased a car of potatoes of 30000 pounds weight at Jewell City, Kansas, and shipped them to Edmond.

"No. 4. On arrival of said car at Edmond, the defendant demanded $131.00 freight on said car, which plaintiff was compelled to pay, to get the car, and did pay under protest.

"No. 5. That at the original rate named by such agent, the freight would have been $87.00 on such car, plaintiff being compelled to pay $131.00 was $44.00 in excess of the amount named and this suit is brought to recover the difference in the freight named, and the amount collected.

"No. 6. That at the time said freight rate was named, by said agent the plaintiff explained to such agent that his

reason for inquiring the rate was that he wanted to buy potatoes in northen Kansas and ship them to Edmond, and expected to use the freight rate named to determine whether he could buy, ship and sell at a profit, and expected to rely on the rate named for that purpose, which said agent fully understood at the. time.

"No. 7· That said car of potatoes was shipped on Nov. 2, 1899, from Jewell City, Kansas, on the line of the Mo. Pacific Railway to Concordia, Kansas, which was a junction point with defendant's line. That its service for hauling said car from Jewell City to Concordia, the Mo. Pacific Railway Co. charged $32.00 which was paid to said company in cash by defendant on Nov. 6, 1899, when said car was delivered to defendant by the Mo. Pacific Railway Co That on said date, nor during the month of Nov. 1901, the defendant and the Mo. Pacific Railway Co. had no joint tariff rate in force between Jewell City, Kansas and Edmond, Okla.

"No. 8. That on said date the regular interstate tariff rate on defendant's line covering freight on car of potatoes between Concordia, Kansas, and Edmond, O. T., was 33 cents per 100 pounds.

"No. 9. That on arrival of said car at Edmond, O. T. on the 13th day of Nov. 1899, the defendant collected from plaintiff as freight on such car the $32.00 it had paid to the Mo. Pacific Railway Company and in addition 33 cents per 100 pounds on 30000 pounds weight, the same being its regular tariff rate covering said shipment.

"No. 10. At the time said agreement was made by said agent, McKinley, as specified in paragraph No. 2, of this agreed statement of facts, the plaintiff did not know the tariff rate established and in force by defendant covering such shipment, but relied entirely on the statement of such agent, McKinley.

o

"No. 11. These facts are agreed to, the plaintiff maintaing that the defendant was bound by the agreement to its agent to a lower rate, when he was advised of the circumstances under which it was made. The defendant insisting that such agreement was void.

'Either party reserving the right to object to the materiality of any fact herein agreed to.

"In witness whereof we do hereunto set our hands this 29th day of Oct. 1903.

"(Signed)             "M. FULTON,
            "Attorney for Plaintiff.
            "J. R. COTTINGHAM,
            "Attorney for Defendant."

Upon this agreed statement of facts, the district court found the issues in favor of the plaintiff, and against the defendant, and entered judgment for the plaintiff. From this judgment the railway company appeals.

Opinion of the court by

HAINER, J.: The only question presented by the record is this: Where a rate lower than the regular published interstate commerce rate was agreed upon between the agent of the railroad company and the shipper from a station in Kansas to a station in Oklahoma, and the regular published interstate commerce rate was demanded and collected at the destination, can the excess between the regular published rate and the contract price be recovered by the shipper?

It is contended by the plaintiff in error that the giving to any shipper of a lower or higher rate upon an interstate shipment than is prescribed by the regular published tariff rate, is in contravention of the federal statute, and therefore illegal and void, and no recovery can be had thereon.

Section 2 of the interstate commerce act, 24 U. S. Stats. L., 379, provides as follows:

"If any common carrier subject to the provisions of this act, shall directly, or indirectly, by any special rate, rebate, drawback or other device, charge, demand, collect, or receive, from any person or persons, a greater or less compensation for any service rendered or to be rendered in the transportation of passengers or property subject to the provisions of this act, than it charges, demands, collects or receives from any other person, or persons for doing for him or them a like contemporaneous service in the transportation of a like kind of traffic, under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

Section 3 of said act provides as follows:

"That it shall be unlawful for any common carrier, subject to the provisions of this act, to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation or locality or any particular description of traffic or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

"Every common carrier subject to the provisions of this act, shall, according to their respective powers, afford all reasonable proper and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines; but this shall not be construed as requiring any such common carrier to give the use of its

tracks or terminal facilities to another carrier engaged in like business."

Section 6 of said act contains the following provisions:

"That every common carrier subject to the provisions of this act shall print and keep for public inspection schedules showing the rates and fares and charges for the transportation of passengers and property which any such common carrier has established and which are in force at the time upon its railroad, as defined by the first section of this act. The schedules printed as aforesaid by any such common carrier shall plainly state the places upon its railroad between which property and passengers will be carried, and shall contain the classification of freight in force upon such railroad and shall also state separately the terminal charges and any rules and regulations which in any wise change, affect, or determine any part of the aggregate of such aforesaid rates and fares and charges. Such schedules shall be plainly printed in large type of at least the size of ordinary pica, and copies for the use of the public shall be kept in every depot or station upon any such railroad, in such places and in such form that they can be conveniently inspected."

Paragraph 3 of said section 6 is as follows:

"No advance shall be made in the rates, fares and charges which have been established and published as aforesaid by any common carrier in compliance with the requirements of this section, except after ten days public notice, which shall plainly state the changes proposed to be made in the schedules then in force, and the time when the increased rates, fares or charges will go into effect; and the proposed changes shall be shown by printing new schedules or shall be plainly indicated upon the schedules in force at the time and kept for public inspection. Reduction in such published rates, fares or charges may be made without previous public notice; but whenever any such reduction is made, notice of the same

shall immediately be publicly posted and the changes made shall immediately be made public by printing new schedules, or shall immediately be plainly indicated upon the schedules at the time in force and kept for public inspection."

Paragraph 4 of said section 6 is as follows:

"And when any such common carrier shall have established and published its rates, fares, and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any service in connection therewith than is specified in such published schedule of rates, fares and charges as may at the time be in force."

Section 10 of said act provides as follows:

"That any common carrier subject to the provisions of this act or whenever such common carrier is a corporation, any director or officer thereof, or any receiver, trustee, lessee, agent, or person acting for or employed by such corporation, who, alone, or with any other corporation, company, person, or party, shall wilfully do or cause to be done, or shall willingly suffer or permit to be done, any act, matter or thing in this act prohibited or declared to be unlawful, or who shall aid or abet therein, or shall wilfully omit or fail to do any act, matter or thing in this act required to be done, or shall cause or willingly suffer or permit any act, matter or thing so directed or required by this act to be done not to be so done, or shall aid or abet any such omission or failure, or shall be guilty of any infraction of this act, or shall aid or abet therein shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof in any district court of the United States, within the jurisdiction of which such offense was committed, to be subject to a fine of not to exceed five thousand dollars for each offense."

The manifest purpose of these provisions is to require the railway company to have one uniform published tariff rate for all interstate shipments, and any other rate, by the positive provisions of the statute, is declared to be unlawful, and is made a high penal offense. Hence, any contract or agreement which directly or indirectly violates the plain provisions of the interstate commerce act, is absolutely void, and non-enforceable in the courts.

The supreme court of the United States, in a very recent opinion, in the case of *New Haven R. R. v. Interstate Commerce Commission,* 200 U. S. 361, has held that the interstate commerce act was enacted to secure equality of rates and to destroy favoritism, and for those purposes is a remedial statute, to be interpreted so as to reasonably accomplish them; its prohibitions against directly or indirectly charging less than published rates are all embracing and applicable to every method by which the forbidden results could be brought about. And that the application of these prohibitions depends not upon whether the carrier intends to violate them, but upon whether it actually does so.

The decision in this case was delivered by Mr. Justice White, and in the course of the opinion he uses this language:

"Concluding, therefore, that both the contracts made by the Chesapeake and Ohio with the New Haven were contrary to public policy and void because in conflict with the prohibitions of the act to regulate commerce, it obviously follows that such contracts were not susceptible of being enforced by the New Haven, and afforded no legal basis for a claim of the New Haven against the Chesapeake and Ohio, and therefore the court below was correct in so deciding."

In *Gulf, Colorado and Santa Fe Railway Company v: Hefley,* 158 U. S. 98, the supreme court of the United States held that:

"The Texas statute of·May 6, 1882, making it unlawful for a railroad company in that state to charge and collect a greater sum for transporting freight than is specified in the bill of lading, is when applied to freight transported into the state from a place without it, in conflict with the provisions of section 6 of the interstate commerce act of February 4, 1887, c. 104, 24 Stat. 379, as amended by the act of March 2, 1889, chap. 382, 25 Stat. 855, that it shall be unlawful for such carrier to charge and collect a greater or less compensation for the transportation of the property than is specified in the published schedule of rates provided for by the act, and in force at the time; and, being thus in conflict, it is not applicable to interstate shipments.

"When a state statute and a federal statute operate upon the same subject matter, and prescribe different rules concerning it, and the federal statute is one within the competency of congress to enact, the state statute must gave way."

The same question was before the court of appeals of the Indian Territory as early as June 7, 1897, and that court, in the case of *Missouri K. & T. Ry. Co. v. Bowles,* 40 S. N. 899, laid down this rule:

"Where a rate lower than the interstate commerce rate was agreed on for a shipment from a territory to a state, but the regular rate was demanded and collected at its destination, the excess cannot be recovered by the shipper, though he did not know his contract was illegal."

Chief Justice Springer, speaking for the court, uses the following language:

"The contention of appellee's counsel that appellee was *in delicto* himself, but not in *pari delicto* is also not ten-

able.    If there was an oral contract entered into, it must have been upon a basis upon which the minds of both the contracting parties met, and if so, and the contract upon which they entered was one forbidden by law, whether they had knowledge of that fact or not, they were both in *pari delicto*. Neither the ignorance of one or both of the parties, nor finely drawn subtleties as to which of the parties was more in fault, than the other, change their legal status of their liability. If the contract which they entered into was prohibited by law, they were both at fault, and the courts will not give validity to or carry into effect such a contract."

In *Houston & T. C. R. Co. v. Dumas,* 43 S. W. 609, the court of civil appeals of Texas, in passing upon this question, says:

"A contract between a station agent and a shipper for an interstate live-stock shipment was entered into on authority from railway headquarters, acting under the mistaken supposition that the shipment was to be within the state.    The rate agreed on was less than the rate posted in the depots of the railways over which the shipment was to be made, in accordance with the law creating the interstate commerce commission, which law (25 Stat. 857) provides that it shall be unlawful for a common carrier to charge or receive a greater or less compensation than is specified in such published schedule:    *Held:* That the rate agreed on was in violation of the interstate commerce act, and the contract could not be enforced."

In *Southern Ry. Co. v. Harrison,* 24 So. Rep. 552, the supreme court of Alabama has held that parties to an interstate shipment are presumed to contract with reference to the acts of congress on that subject, and such contracts cannot be construed with reference to any other law. and hence under section 6 of the interstate commerce act, requiring in-

terstate carriers to post their tariffs, and prohibiting them from charging rates other than those published, a contract for the transportation of an interstate shipment at less than the published rate approved by the interstate commerce commission is invalid; and the carrier may collect the rate as published, regardless of that fixed by the bill of lading.

In *Chicago, R. I. & P. Ry. Co. v. Hubbell*, 38 Pac. 266. the supreme court of Kansas held that a contract for the transportation of freight from a point in Missouri to a point in Kansas for a rate less than that demanded and collected from other persons for a like service at the same time, where the usual rate is not unreasonable nor excessive, violates the provisions of the interstate commerce act, and is utterly void. And the fact that a special rate was offered the plaintiff by mistake of the agent of one of two connecting lines of railroad cannot give any added force to the contract. A contract made by mistake can have no greater validity than one intentionally entered into.

In *Gerber v. The Wabash Railroad Company*, 63 Mo. App. 145, the rule is stated as follows:

"When a contract is made for an interstate shipment, the shipper must be held to have contracted with reference to and in accordance with the rates fixed by the schedules provided for by the interstate commerce law, regardless of the terms of the contract. Accordingly, the schedule rate of freight is payable on the shipment though the carrier has by mistake given a lower rate."

In the course of the opinion, the court uses the following language, which we think is directly applicable to the case under consideration:

"The sole question is whether the courts will, under any circumstances, enforce contracts of interstate shipments which are in violation of the provisions of the interstate commerce act? By that act it is made unlawful for a common carrier to issue bills of lading, at, or receive or demand a rate of freight variant from the rates or terms for such shipment as shown by the schedules which are required to be posted and also filed with the interstate commerce commission, and if such an offense is committed knowingly, the offender subjects himself to severe penalties. And the act further provides that, if any person by connivance with the carrier knowingly secures transportation at less than the regular rates, he is likewise subject to the penalties of the act. Now, in the case at bar, it is conceded that the original bill of lading was not issued in accordance with the terms and conditions of the published schedule, but it is argued in support of the judgment that the schedules are no part of the law, and that, as it is conceded that neither Porter Brothers nor the plaintiff had personal knowledge of their contents, the contract, though illegal, will be enforced. This is upon the principle which courts sometimes apply, that unless the parties were in *pari delicto* as well as *particeps criminis.* an illegal contract will be enforced where its enforcement is necessary for the protection of the more innocent party. This rule, however, can only be invoked under circumstances which show that a wise public policy would be advanced by allowing the more innocent party to succeed. Considering the evils which the interstate commerce law was intended to remedy, would it, under any circumstances be good policy to allow contracts made in violation of it to be enforced specifically? We think not. Prior to its enactment, the complaint was almost universal that the common carriers were discriminating in their rates in favor of favored shippers. To remedy this evil as to interstate shipments, congress enacted the law, and it should be construed and enforced so as

not in the least to thwart its purpose. Strictly speaking, the published schedules are not a part of the law itself, but are the results of the acts of the carrier and the interstate commerce commissioners in execution of the law. But every shipper must be presumed to know of the existence of the schedules, and that they are open for his inspection, and also of the terms of the act rendering invalid every contract of affreightment not made in accordance therewith. Therefore, when a contract for an interstate shipment has been made and is sued upon, or property rights are made dependent thereon, the shipper must be held to have contracted with reference to and in accordance with the rates fixed by the schedules, regardless of the terms of his contract. In other words, the rates of interstate shipments are not the subject of contract, but are in effect fixed under the law. To hold differently would be subversive of good policy and it would tend to nullify the law."

In *Hawley v. Kansas & Texas Coal Co.* 30 Pac. 14, the supreme court of Kansas, in construing a similar contract, speaking by Mr. Justice Valentine, says:

"It has been the uniform rule of this court, and indeed in all courts, to hold that contracts tainted with illegality are absolutely void; and certainly no person can be permitted to go into a court of justice with a demand founded only upon an illegal transaction in which he has been an active participant."

And in *Bass v. Smith*, 12 Okla. 485, this court has laid down the following rule:

"No action either at law or in equity can be mantained on a contract that is forbidden by law. The sound policy of the law is to leave the parties in all such cases without a remedy, since the courts will not lend aid to a party who bases his action on a contract in violation of the organic law

or the statute, or upon an act that is immoral, or is in contravention of sound public policy. No legal right can arise from such a source."

This doctrine is clearly enunciated in that excellent treatise, Cyclopedia of Law and Procedure, vol· 9, page 546, as follows:

"No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out; nor can he set up a case in which he must necessarily disclose an illegal purpose as the ground-work of his claim. The rule is expressed in the maxims, *Ex dolo malo non oritur actio,* and *In pari delicto potior est conditio defendentis.* The law in short will not aid either party to an illegal agreement; it leaves the parties where it finds them. Therefore neither a court of law nor a court of equity will aid the one in enforcing it, or give damages for a breach of it, or set it aside at the suit of the other, or, when the agreement has been executed in whole or in part by the payment of money or the transfer of other property, lend its aid to recover it back. The object of the rule refusing relief to either party to an illegal contract, where the contract is executed, is not to give validity to the transaction, but to deprive the parties of all right to have either enforcement of, or relief from, the illegal agreement."

It follows that the agreement between the agent of the railway company and the shipper in the case was in contravention of the federal interstate commerce act, and is therefore against public policy and void, which precludes the plaintiff from recovering in this action. The judgment of the district court is therefore reversed, and the cause remanded with directions to enter judgment for the defendant in the court below.

Burwell, J., who presided in the court below, not sitting; Pancoast, J., concurring but not the principle stated in the opinion, holding that information given by the agent of the rates in force amounted to a contract to ship at such rate; Burford, C. J., concurring in results but not in all the reasonings; Garber, J., and Gillette, J., dissenting on the ground that it does not appear that the shipper acted or intended to act in act in violation of the interstate commerce act, holding that the company cannot give a rate forbidden and then rely on the law to allow it to injure the shipper and that the company should stand by its agreements and answer to the offended law for its violation; all the other Justices concurring.