# TEXAS AND PACIFIC RAILWAY COMPANY v. CISCO OIL MILL.

ERROR TO THE COURT OF CIVIL APPEALS FOR THE SECOND
SUPREME JUDICIAL DISTRICT OF THE STATE OF TEXAS.

No. 79. Submitted November 2, 1906.—Decided February 25, 1907.

*Texas & Pacific Railway* v. *Abilene Cotton Oil Co.*, *ante*, p. 426, followed
as to abrogation by passage of Interstate Commerce Act of common-
law remedy for recovery of unreasonable freight charges on interstate
shipment where rates charged were those duly fixed by the carrier ac-
cording to the act and which had not been found unreasonable by Inter-
state Commerce Commission.

A tariff of rates of which schedules have been filed by a carrier with the
Interstate Commerce Commission and also with its freight agents is in force
and operative although the copies thereof may not have been posted in
the carrier's depots as required by the act.

Such posting is not a condition precedent to the establishment of the rates
but a provision for affording facilities to the public for ascertaining the
rates actually in force.

THE facts are stated in the opinion.

*Mr. John F. Dillon, Mr. Winslow S. Pierce, Mr. David D.
Duncan* and *Mr. Thomas J. Freeman,* for plaintiff in error.[1]

*Mr. John J. Butts,* for defendant in error.[1]

MR. JUSTICE WHITE delivered the opinion of the court.

This writ of error is prosecuted to obtain the reversal of a
judgment for $641.69, with interest, entered in favor of the
Cisco Oil Mill by the Court of Civil Appeals of Texas upon the
reversal of a judgment of a district state court in favor of
the Texas and Pacific Railway Company. The action was

[1] See abstracts of arguments in No. 78, involving similar questions and
argued by same counsel.

brought by the oil company to recover of the railway company the principal sum just stated, because of alleged overcharges by the railway company, paid by the oil company under protest at the time of the delivery of four cars of cotton seed, shipped in the month of September, 1901, from towns in Louisiana east of Alexandria, in that State, to Cisco, Texas. The appellate court, after excluding as surplusage averments in the petition "evidently designed to bring the case within the provisions of the Interstate Commerce Act," was of opinion and decided the case upon the hypothesis that the petition stated a valid cause of action at common law for the recovery of the sums coercively collected upon the delivery of the merchandise, in excess of a reasonable rate, and adopted the finding of the trial court as to the amount of the unreasonable exaction.

In its opinion the Court of Civil Appeals expressly declared that the trial court had rendered judgment in favor of the railway company because the rate demanded and collected of the oil company "was in accord with appellee's rate sheets and freight schedule which had been filed with the Interstate Commerce Commission and promulgated as provided by the act of Congress." Deciding, however, that the case before it presented "substantially the same questions upon substantially the same state of facts" which had been passed on in the case of *Abilene Cotton Oil Co.* v. *Texas & Pacific Railway Company,* the court, for the reason given by it in that case, reversed the trial court and rendered judgment in favor of the Cisco Oil Mill.

The considerations which made necessary our decision, just announced, reversing the judgment of the Court of Civil Appeals in the *Abilene case,* equally apply in the instant case and compel like action. And this result follows despite the contention that a right of action existed, because it is assumed no schedule rate was in existence when the shipments were made. This was based on the claim that it was not affirmatively found below that the schedule of rates applicable to the

shipments in question had been posted as required by section 6 of the act to regulate commerce, noted in margin.[1]

The assumption, it is insisted, is authorized because, it is asserted, the conclusion that the schedule of rates became legally operative was not justified by the finding that such schedule had been filed with the Interstate Commerce Commission and copies thereof furnished to the freight officers of the railroad company at Cisco and other points. The contention is without merit. The filing of the schedule with the commission and the furnishing by the railroad company of copies to its freight offices incontrovertibly evidenced that the tariff of rates contained in the schedule had been established and put in force as mentioned in the first sentence of the section, and the railroad company could not have been heard to assert to the contrary. The requirement that schedules should be "posted in two public and conspicuous places in every depot," etc., was not made a condition precedent to the establishment and putting in force of the tariff of rates, but was a provision based upon the existence of an established rate, and plainly had for its object the affording of special facilities to the public for ascertaining the rates *actually in force.* To hold that the clause had the far-reaching effect

---

[1] First paragraph of section 6 of the Act to Regulate Commerce, as amended March 2, 1889 (25 Stat. L. 855):

"That every common carrier subject to the provisions of this act shall print and keep open to public inspection schedules showing the rates and fares and charges for the transportation of passengers and property which any such common carrier has established and which are in force at the time upon its route. The schedules printed as aforesaid by any such common carrier shall plainly state the places upon its railroad between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately the terminal charges and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates and fares and charges. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected."

claimed would be to say that it was the intention of Congress that the negligent posting by an employé of but one instead of two copies of the schedule, or the neglect to post either, would operate to cancel the previously established schedule, a conclusion impossible of acceptance. While section 6 forbade an increase or reduction of rates, etc., "which have been established and published as aforesaid," otherwise than as provided in the section, we think the publication referred to was that which caused the rates to become operative; and this deduction is fortified by the terms of section 10 of the act making it a criminal offense for a common carrier or its agent or a shipper or his employé improperly "to obtain transportation for property at less than the regular rates then established and in force on the line of transportation of such common carrier."

Whether by the failure to post an established schedule a carrier became subject to penalties provided in the act to regulate commerce, or whether if damage had been occasioned to a shipper by such omission, a right to recover on that ground alone would have obtained, we are not called upon in this case to decide.

*The judgment below is reversed and the case remanded for further proceedings not inconsistent with this opinion.*