## STATE COURTS WITHOUT JURISDICTION OVER INTERSTATE FREIGHT RATES.

Common Pleas Court of Lucas County.

OHIO DAIRY COMPANY v. THE LAKE SHORE & MICHIGAN SOUTHERN RAILWAY COMPANY.

Decided, October 12, 1908.

*Reasonableness of Freight Rates—Proposed Increase in Rates on Interstate Shipments—Can not be Temporarily Enjoined by a State Court—Shipping Contracts to be Performed Within and Between States—Extent of Federal Judicial Power—Relief Which may be Granted by State Courts—Injunction—Discrimination—Jurisdiction—Sections 244-11 and 3373-1.*

A state court is without jurisdiction to temporarily enjoin the putting into effect of an increase in freight rates on interstate traffic, pending a determination by the Interstate Commerce Commission of the question of the reasonableness of the proposed rate.

*Doyle & Lewis*, for motion.
*G. W. Kinney*, contra.

BASSETT, J.

This matter comes up for decision at this time on the motion of the railway company to dissolve the temporary injunction heretofore granted herein, for the reasons that this court has no jurisdiction over the subject-matter, and that the petition does not state facts sufficient to entitle the plaintiff the relief prayed for.

The plaintiff is an Ohio corporation, with its principal office located in the city of Toledo. Its business is that of purchasing and collecting cream and milk in the states of Ohio and Michigan and elsewhere and causing the same to be transported by the defendant and other common carriers from the place of purchase and collection to its creamery in said city, and thereafter manufacturing a portion of the same into butter, and selling said cream, milk and butter. It is further averred that thirty

per cent. of all the cream so purchased and collected by it comes from the northern part of Ohio and the eastern part of Michigan · and in territory tributary to the lines of the defendant company, and that the amount thus stated has been transported from the territory mentioned to Toledo over the lines of the defendant. The plaintiff says that it has been engaged in that business ·for a period ·of between three and four years, and has actually invested in its business about one hundred and fifty thousand dollers.

The cause of the complaint now made by the plaintiff against the defendant is that the latter on or about the 26th day of June, 1908, adopted a new schedule of rates· for the transportation of cream shipped into the city of Toledo from the territory referred to, which new schedule was to have gone into effect on the first day of August, 1908; but it was· not enforced because of the restraining order issued in this cause.

Plaintiff says that the new rates did not affect the transportation of milk, but applied only to the transportation of cream, and that the rates for the transportation of milk remained the same as theretofore, according to the plaintiff's information. It further says that the new schedule for the transportation of cream will result in an increased cost of substantially fifty per cent. over the lines of the defendant company, for a distance not exceeding sixty miles from Toledo. It further alleges that the price which it pays for cream is based upon the weekly rates fixed by the Elgin Butter Board, and that it would be impossible for plaintiff to pay a greater price for cream purchased by it and make any money, because of the close competition in said business. It is further set forth by the plaintiff that it has *no contract* with the *producers* of cream, whereby the said producers are under any obligations to furnish cream to it, and that the custom has been to accept all cream shipped by said producers to the plaintiff and pay for the same at the rates referred to in the petition.

The further allegation is made that the producers of cream could not afford to and could not sell said cream to the plaintiff at the prices so fixed, if they were obliged to pay the above

stated increased tariff rate; but that if compelled to pay said increased tariff rate, *they would refuse* to ship cream to plaintiff.

It is further alleged that if said new tariff rates are permitted to be enforced, the plaintiff will be unable, as the direct result therefrom, to obtain any cream from purchasers on the line of the said defendant's road, over which it now is and heretofore has been receiving thirty per cent. of all the cream received by it, to the great and irreparable damage of the plaintiff, for which it has no adequate remedy at law.

The plaintiff says that by reason of the publication of the new schedule of rates by the defendant, knowledge thereof has come to many of the producers, who have been heretofore selling to the plaintiff, and many of said producers *have already refused* to ship cream to plaintiff, and have notified plaintiff that they *will refuse* in the future to ship it.

The plaintiff further says that the existing tariff rates set forth in the petition have been and still are fully compensatory and remunerative to the defendant for the services rendered in and about the transportation of cream, and that the defendant has been and still is earning profits under and by means of said existing tariff rate; that the proposed increased tariff rate was not made necessary by reason of any changed conditions affecting the transportation of cream, or the service rendered in connection therewith, and that the same is unreasonable, unjust, vicious, excessive and extortionate, and has been arbitrarily imposed by the defendant.

It is further stated in the petition that there is now pending before the Interstate Commerce Commission, an action or proceeding brought by the Blue Valley Creamery Company and the Beatrice Creamery Company against the Michigan Central Railroad Company and other railroads, in Chicago, which action involves the validity under the Interstate Commerce law of increased tariff rates, on the transportation of cream, and that the decision of the commission will determine whether or not the railroad companies are justified in charging said increased rates.

This language of the pleader may be fairly taken as an admission that the question here presented is a federal question.

Or, as stated in his brief, the plaintiff in the case before us is "simply asking that the railroad company be enjoined from changing unreasonably and unjustly its existing rates until the question of the justness and reasonableness of the previous rates may be passed upon by the Interstate Commerce Commission."

By its motion to dissolve the temporary injunction in this case, the defendant challenges the jurisdiction of this court over the subject-matter of the controversy; and contends that not this court but either the Interstate Commerce Commission or the Ohio Railroad Commission is the proper tribunal to hear and determine, in the first instance, the question of the reasonableness or unreasonableness of the rate in question—according to whether the rate relates to interstate or intrastate shipments

The federal rate law, so-called, has a national and interstate object and purpose. It is designed to establish uniformity and equality in railroad freight rates in interstate commerce or traffic, because the several states themselves can not lawfully do so. It is in no sense local or municipal, as distinguished from national or interstate. It is intended to operate upon all the people equally, and, if we may borrow the language of the fifth enumeration of the preamble of the federal Constitution, "to promote the general welfare." Its purpose is to prevent favoritism or discrimination, and to extend to all persons equal opportunities and facilities for receiving and shipping freights of all kind of the same class.

Railway rates enter to a greater extent than might at first thought be supposed into the business operations of this country. Manifestly, it is an economic hardship and an economic waste for the farm, the mine, or the factory, to put labor and capital into the production of commodities if they can not be transported to market at reasonable rates and with reasonable dispatch. For many years the right of railroads to alter or advance their rates went unquestioned, but gradually, step by step, the situation became such that both courts and legislatures, as well as Congress, were impelled to take action on this subject. One result of it all was the enactment by Congress of the present rate law and the amendments thereto.

Under our plan of government there is reserved to the states, on the score of expediency alone, if for no other reason, the entire control of their internal affairs. But the federal government, though limited in the number of its objects to those which are national or interstate, is nevertheless supreme in those objects; and in cases of conflict or doubt the state government must yield, being thus far subordinate. This would result necessarily from the very nature of the two governments. But to avoid all shadow of doubt on so momentous a subject, this supremacy is declared by the federal Constitution in these explicit terms:

"This Constitution, and *the laws* of the United States which shall be made in pursuance thereof   *   *   *   shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

Stronger language than this would be difficult to formulate. It is clear and decisive. The lower must yield to the higher authority and power.

The federal Constitution goes still further. It enumerates, specifically, the objects to which the judicial powers shall extend. And it is provided that:

"The judicial power shall extend to all cases in law and equity arising under this Constitution or the laws of the United States," etc.

It would seem that this language confers the whole power of deciding these and other proper questions in law or in equity upon the federal judiciary. And, of course, if this be true, nothing is left to be exercised by any other tribunal, unless, for special reasons and to meet special emergencies, some other tribunal is created by the act of Congress.

It might also be here stated that in the first draft of this clause of the Constitution, as originally reported to the Federal Convention, the declaration of supremacy was confined to *acts of Congress.* Reference to the *Constitution* was entirely omitted, but was afterwards adopted by unanimous vote, in order that

there might be no doubt as to the powers of the federal judiciary to expound the Constitution, *as well as the laws of Congress*, in all cases of a judicial nature.

When, therefore, such a case is presented as grows out of or involves any provision of the federal Constitution, *or the laws of Congress,* it falls exclusively within the jurisdiction of the federal court, or of that tribunal which has been especially created to meet the particular emergency. And this without reference to the parties. The jurisdiction thereby becomes either original, exclusive, concurrent, or appellate, dependent upon the provisions of the act in that regard.

Each state is therefore entirely sovereign within its territorial limits, and is also subordinate to the federal government. No law of Ohio is or could be enforcible in relation to interstate commerce. The courts of Ohio have no jurisdiction in such matters, and can not control freight rates affecting interstate traffic. *Ashley* v. *Ryan,* 49 O. S., 504, 526 (aff. 153 U. S., 436) ; *Perry* v. *Torrence,* 8 Ohio, 521, 523.

The inability of the separate states to deal with such transactions as are involved in this controversy made it necessary for the Congress to enact the so-called rate law, and amendments thereto, and in doing so it fixed the remedy for such violations as occur thereunder.

If the rates complained of were such as affected and grew out of shipping contracts to be performed entirely within the boundaries of Ohio, there is no question but what the courts of Ohio, as well as the Railroad Commission of Ohio, would have jurisdiction in such cases; and the Interstate Commerce Commission would not have jurisdiction thereof. *Interstate Com. Commission* v. *Railway,* 77 Fed. Rep., 942.

Special provisions have been made by the General Assembly of Ohio for controversies of this character. Section 244-11, passed April 2d, 1906, and kindred sections, create such a railroad commission and define its powers, as well as define certain duties of a public nature that shall be performed by the railroad companies. *City of Zanesville* v. *Farran,* 53 O. S., 605 (par. 2 syl.).

If, upon investigation by the State Commission, the rate or rates or any regulation, practice or service complained of, shall be found to be unreasonable or unjustly discriminatory, or the service shall be found to be inadequate, the Commission has the power to grant relief; and in that event, if its orders are not complied with, it may compel compliance by proceedings in mandamus, injunction or by other proper civil proceedings.

It is further provided by the statutes of Ohio (notably by Section 3373-1 of the Revised Statutes) that *the courts* may grant relief in cases where railroad companies do not secure and extend to all shippers the same and equal opportunities and facilities for receiving and shipping freight.

One of the most recent cases of this kind, considered by the Supreme Court of Ohio, is that of *The Toledo & Ohio Central Railway Company* v. *Wren,* decided April 14th, 1908 (78 O. S., 137).

So that it will be conceded that these rate matters are cognizable, in proper cases, either by the state railroad commission or by the state courts, because of the scope and character of our statutes on the subject of railroad shipments.

It is undisputed that the rates complained of in the case before us involve freight rates on interstate traffic, that is, on shipments originating in Michigan and destined for Toledo, in Ohio; and, therefore, it follows that this action can not be disposed of without considering the law of Congress relating to that subject.

Whether it is the duty of the complaining shipper to file his grievances with the Interstate Commerce Commission, in the first instance, or file them in the federal court, becomes an important matter, but we need not determine it here, for it has already been considered by the United States Supreme Court. In the case of *Texas Pacific Railway Co.* v. *Abiline Cotton Oil Co.,* 204 U. S., 426, that court has given its interpretation of the language of Section 9 of the Interstate Commerce act. That was a suit originally instituted in a state court. The oil company claimed that the charges made by the railway company were

exorbitant.    The railway contended that the reasonableness of the posted rates could not be contested in the state court, and the trial court sustained the position of the railway company, but the Texas court of final resort reversed that holding and gave judgment.    The Supreme Court of the United States set aside this judgment.    Section 9 of the act reads, in part, as follows:

"That any person or persons claiming to be damaged by any common carrier subject to the provisions of this act, may either make complaint to the *Commission* as hereinafter provided for, *or* may bring suit in his or their own behalf, for the recovery of the damages for which such common carrier may be liable under the provisions of this act, in any *district* or *circuit court* of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, but must, in each case elect which one of the two methods of procedure herein provided for he or they will adopt."

With special reference as to whether the complaint should be made before the Interstate Commerce Commission, the court say:

"When the general scope of the act is enlightened by the considerations just stated, it becomes manifest that there is not only a relation but an indissoluble unity between the provisions for the establishment and maintenance of rates until corrected in accordance with the statutes and the prohibitions against preferences and discrimination.    This follows, because, unless the requirement of a uniform standard of rates be complied with, it would result that violations of the statute as to preferences and discrimination would inevitably follow.    This is clearly so, for if it be that the standard of rates fixed in the mode provided by the statute could be treated on the *complaint of a shipper* by a court and jury as unreasonable, *without reference to prior action by the Commission*, finding the established rate to be unreasonable and ordering the carrier to desist in the future from violating the act, it would come to pass that the shipper might obtain relief upon the basis that the established rate was unreasonable, in the opinion of the court and jury, and thus such shipper receive a preference and discrimination not enjoyed by those against whom the schedule of

rates was continued to be enforced.  *  *  *  If, without previous action by the Commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that unless all courts reached an identical conclusion, a uniform standard of rates in the future would be impossible, as the standard would conflict and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject as an *original* question.  Indeed, the recognition of such a right is wholly inconsistent with the administrative power conferred upon the commission, and with the duty which the statute casts upon that body, of seeing to it that the statutory requirements as to uniformity and equality of rates is observed. Equally obvious is it that the existence of such a power in the courts, independent of prior action by the commission, would lead to favoritism and the enforcement of one rate in one jurisdiction and a different one in another, would destroy the prohibitions against preferences and discrimination and afford a ready means by which, through collusive proceedings, the wrongs which the statute was intended to remedy could be successfully inflicted.  Indeed no reason can be perceived for the enactment of the provision endowing the administrative tribunal which the act created  *  *  *  if the power was left in the *courts* to grant relief on complaint of any shipper upon the theory that the established rate could be disregarded and be treated as unreasonable, without reference to *previous action* by the Commission in the premises.  This must be, because, if the power existed in both courts and the Commission to originally hear complaints on this subject, there might be a divergence between the action of the Commission and the decision of a court.  In other words, the established schedule might be found reasonable by the Commission in the first instance, and unreasonable by a court acting *originally,* and thus a conflict would arise, which would render the enforcement of the act impossible.''

These quotations go to show that as to the reasonableness or unreasonableness of freight rates on interstate commerce, the Interstate Commerce Commission has original jurisdiction pertaining to the same, and is the proper tribunal with which to lodge complaints of the character involved in the case now under consideration, particularly when the schedule complained of is an established tariff, legally filed, published and posted as required by the federal statute, as is conceded in this case.

There is another section of the Interstate Commerce act (Section 22) which bears upon this subject, and should not be overlooked. It is therein provided:

"Nothing in this act contained shall, in any way, abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies."

In construing this section, however, Justice White says:

"This clause, however, can not in reason be construed as continuing in shippers a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act can not be held to destroy itself. * * * The proposition that if the statute be construed as depriving courts generally, of the power to grant redress, upon the basis that the established rate was unreasonable, without previous action by the Commission, great harm will result, is only an argument of convenience, which assails the wisdom of the legislation or its efficiency, and affords no justification for so interpreting the statute as to destroy it."

In the concluding part of the opinion of Justice White, the following language is used:

"Concluding, as we do, that the shipper seeking reparation predicated upon the unreasonableness of the established rate, must, under the act to regulate commerce, primarily invoke redress through the Interstate Commerce Commission, which body alone is vested with power originally to entertain proceedings for the alteration of an established schedule, because the rates fixed therein are unreasonable, it is unnecessary for us to consider whether the court below would have had jurisdiction to afford relief, if the right asserted had not been repugnant to the provisions of the act to regulate commerce. It follows, from what we have said, that the court below erred in the construction which it gave to the act to regulate commerce."

Again, it is said in the case of *U. S.* v. *Railway,* 122 Fed., 544, 546:

"But in that case, the Interstate Commerce Commission had never granted a hearing, or made an order in the matter in-

volved.  The Commission is the tribunal instituted by the government to inquire primarily into the fact as to whether discrimination exists.  Until an inquiry is there made, and finding and order had, the jurisdiction of a *court of equity* may not be invoked, because, for a court to take hold, at that primary point in a case, would be to transfer the jurisdiction of the Interstate Commerce Commission—the jurisdiction to first inquire into the facts—to a court of equity.  In practical application it would abolish the Interstate Commerce Commission and devolve upon a master in chancery the preliminary inquiry into the facts.''

Another case bearing upon this controversy, is that of *Kinnassy* v. *Railway*, 81 Fed., 803, the court there using this language:

''The rates so published and on file are the only rates the carrier can charge, and any variation from them subjects the carrier to the penalties of the act. * * * These rates as published and filed must therefore be *prima facie* the criterion in determining whether a given charge is reasonable or not.  If the charge conforms to the schedule of rates, it is therefore *prima facie* reasonable.  Under such circumstances, therefore, to state a cause of action based upon Section 1 of the act, there must be an averment there that the carrier failed to publish its schedule of rates, or that it charged in excess of the rates as published and then in force, and in either case that the charge as made was unreasonable, or an averment of other facts sufficient to do away with the *prima facie* effect of the schedule rates.''

And still another adjudication might be cited.  In the case of *Texas Pacific Ry. Co.* v. *Cisco Oil Mills*, 204 U. S., 449, the United States Supreme Court held that interstate freight rates are *established* when a schedule thereof is filed by a carrier with the Commission and copies are furnished by the railway company to its freight offices, although such rates may not be ''posted'' as required by Section 6 of the act.

In view of these decisions to which we have called attention, and in view of the allegations of the petition, the court holds that the restraining order *pendente lite* heretofore granted by another branch of this court, and made, as is frequently done,

upon *ex parte* hearing and without argument or citation of authorities, should be dissolved.

The court is further influenced to grant the motion by the well established rule that the burden of establishing the right to a perpetual injunction is upon the party asking for it. It is true that the court is not asked directly to make restraining order of perpetual binding force upon the railway company, but is asked to continue it in force until someone else, foreign to this case and in some other jurisdiction, obtains in the future, in a similar controversy, a decision by the Interstate Commerce Commission. This would entail a delay which the defendant vigorously objects to, and which the court is not warranted in favoring. For, as is so often said in different adjudications, "the court will grant a perpetual injunction only when a clear right thereto is shown." *Spangler* v. *Cleveland*, 43 O. S., 526.

This being a subject-matter, therefore, of which this court can not entertain jurisdiction, the motion is granted, and the action dismissed.