## ATCHISON, T. & S. F. RY. CO. v. EHRET et al.

No. 5801.    Opinion Filed November 9, 1915.

(152 Pac. 1107.)

1. **CARRIERS—Interstate Shipment—Published Rate.** One obtaining from a common carrier a contract to transport an interstate shipment at a less rate than the schedule rate published and approved by the Interstate Commerce Commission, and in force at the time of the shipment, is not entitled to a delivery of the goods from the common carrier until he pays the rate provided in the official schedule.

2. **SAME—Recovery of Schedule Rate.** Where in such case the carrier makes a contract to transport the property for a less rate than that provided in the official schedule, and upon its arrival at the destination delivers same to the assignee, receiving the amount called for by the lesser rate, it may recover the official schedule rate, for the act of Congress is intended to prevent rebating, and if such a transaction were upheld it would furnish a method by which rebating might be practiced.

(Syllabus by Devereux, C.)

*Error from County Court, Oklahoma County;*
*John D. Hayson, Judge.*

Action by the Atchison, Topeka & Santa Fe Railway Company against C. J. Ehret and another, doing business as the Oklahoma City Foundry & Machine Shops. Judgment for defendants, and plaintiff brings error. Reversed, and remanded for new trial.

This was an action brought by the Atchison, Topeka & Santa Fe Railway Company, hereinafter designated plaintiff, against C. J. Ehret and Con Ehret, partners, hereinafter designated as defendants, for the collection of an undercharge on an interstate shipment of freight from Johnstown, Pa., to Oklahoma City, in the amount of $62.20. The action was originally brought in a jus-

tice court, resulting in judgment for the defendants, and by plaintiff appealed to the county court of Oklahoma county, where a demurrer to the plaintiff's evidence was sustained, and judgment rendered for the defendants for costs.

The shipment in question consisted of certain iron and steel beams and channels, and moved from Johnstown on October 2, 1909. When the shipment was received at Oklahoma City, freight charges were collected from the defendants in the sum of $363.63. This amount was arrived at by the application of a tariff of 69 cents per 100 pounds. At the trial the following stipulation was entered into:

"It is hereby agreed and stipulated by and between the said plaintiff and said defendants that during the trial of said cause, and prior to the interposing of the demurrer of the defendants to the evidence of plaintiff, the plaintiff agreed and admitted in open court as follows: That plaintiff admitted in open court that it entered into an oral contract with the defendants for the 69 cents per hundred weight on the shipment in controversy between Johnstown, Pa., and Oklahoma City, Okla.; that the plaintiff intended to collect only said sum of 69 cents per hundred weight, or the sum of $363.63; that said amount was paid by the defendants to and received by the plaintiff in pursuance of said oral agreement, and that the shipment and car load of goods was delivered to the defendants at destination, Oklahoma City, on receipt of said sum by plaintiff from defendants; that plaintiff, at the time of the delivery of said shipment and receiving said money, did not demand the payment of a greater rate or amount than was paid at that time; that the claim of plaintiff herein and the suit is for the balance claimed to be due plaintiff from defendants between the sum so agreed by defendants to be paid, to wit, 69 cents

per hundred weight, and what plaintiff claims is the legal rate as provided by the Hepburn law."

The plaintiff also introduced the official schedule of rates on file in the office of the secretary of the Interstate Commerce Commission, which was in effect at the date of this shipment, and which showed that the legal rate on shipments of this character from Johnstown, Pa., to Oklahoma City, was 80 cents per 100 pounds.

There was a demurrer to plaintiff's evidence, which was sustained, a motion for a new trial, which was overruled, and exception saved, and the case is brought to this court by petition in error and case-made.

*Cottingham & Hayes* and *Charles H. Woods,* for plaintiff in error.

*Estes & Moore,* for defendants in error.

Opinion by DEVEREUX, C. (after stating the facts as above). It is not denied by the defendants that if the plaintiff had declined to deliver this property, and had held it until the tariff provided by the official schedule filed with the Interstate Commerce Commission was paid, it would have had the right to do so, and that the defendants would have been forced to pay the difference between the 69 cents and the official tariff of 80 cents, and this is well settled by the authorities. *A., T. & S. F. R. Co. v. Holmes,* 18 Okla. 92, 90 Pac. 22; *A., T. & S. F. R. Co. v. Bell,* 31 Okla. 238, 120 Pac. 987, 38 L. R. A. (N. S.) 351; *Texas & Pacific R. Co. v. Mugg,* 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011; *Texas & Pacific R. Co. v. Abilene Cotton Co.,* 204 U. S. 449, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075; *Kansas City Southern v. Albers Commission Co.,* 223 U. S. 573, 32 Sup. Ct. 316, 56 L. Ed. 556. The defendants, however, argue that the contract to

transport this freight for 69 cents was illegal, because for a less rate than that provided in the official schedule; that the doctrine *"Ex turpi causa non oritur actio"* applies; and that, the illegal contract having been consummated, the plaintiff will not be allowed to recover. In *Blinn Lumber Co. v. Southern Pacific,* 18 Inter. Com. Com'n, 430, it is said:

"A carrier may not demand or collect a greater or less or different compensation for the transportation of passengers or property than the rates specified in the tariff filed and in effect at the time of the movement (section 6 [U. S. Comp. St. 1913, sec. 8569]); and under the Elkins Act (section 1 [section 8597]) not only is it provided that the carriers shall strictly observe their tariffs, but that it shall be unlawful for any person or corporation to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce. * * * Here, then, is a statutory duty imposed upon the carrier to charge, and upon the shipper to pay, the rate fixed in the tariffs, and deviation from this rule subjects both carrier and shipper to fine or imprisonment."

The action, however, is not on the illegal contract. The contract of 80 cents per 100 pounds is a contract made by the law itself between the parties, and this action is on the contract made by the law, and not upon an attempted illegal contract. In any event, however, under the circumstances of this case, this maxim does not apply. The object in passing the Interstate Commerce Act, and the stringent provisions therein contained in regard to filing tariffs, was to cure an enormous evil, that of railroads giving to certain favored shippers rebates and thus discriminating against other shippers. This could be accomplished if the court should hold that, where an illegal contract has been executed, the railroad

is without power to collect the difference between the illegal tariff contracted for and the legal tariff. The object of the act was not to collect penalties, but the penalties were provided as a means to prevent discrimination. In *A. J. Poor Grain Co. v. C., B. & Q. R. Co.*, 12 Inter. Com. Com'n, 418, it is said:

"The same contention has been made in other cases, resting upon similar facts, that have been heard before the commission and the courts. But under the decisions of the Supreme Court of the United States in *Texas & Pacific Ry. Co. v. Mugg*, 202 U. S. 242 [26 Sup. Ct. 628, 50 L. Ed. 1011], and *Gulf, Colorado & Santa Fe Ry. Co. v. Hefley*, 158 U. S. 98 [15 Sup. Ct. 802, 39 L. Ed. 910], the question of the liability of carriers for the mistakes of their agents in quoting freight rates to shippers seems not to be open to further discussion. In the former case an agent of the railway company, who ought to have been advised of the lawful rate, inadvertently quoted to the plaintiff a rate on a shipment then in contemplation that was lower than the published rate; in the latter case an agent of the defendant railroad company, not only named to the plaintiff a rate lower than the lawfully published rate, but inserted the erroneous lower rate in the bill of lading that was issued for the movement. In each case the Supreme Court of the United States held that the published tariff controlled, and that the lawfully published rate was the rate to be applied and collected on the shipment, notwithstanding the erroneous quotation of another and lower rate. And of necessity no other conclusion was possible if the integrity of this regulative legislation is to be preserved. If a mistake in naming a rate between two given points is to be accepted as requiring the application of that rate by the carrier, the great principle of equality in rates, to secure which was the very purpose and object of the enactment of these several statutes, might as well be abandoned. If the act of a railroad clerk, whether through mistake or otherwise, in quoting a

less than the lawful rate or inserting a lower rate in a bill of lading is to be held to require, or to justify and excuse, the substitution of that rate on a particular shipment for the lawfully published rate, the effectiveness of such legislation is at an end and its whole purpose destroyed. For past experience shows that billing clerks and other agents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored shippers, while other shippers, less fortunate in their relations with carriers and whose traffic is less important, would be compelled to pay the higher published rates. Stability and equality of rates are more important to commercial interests than reduced rates. It was instability and inequality that were the special evils to be remedied; it was the possibility that one shipper, in one way or another, whether by mistake or otherwise, could, and actually did, get a lower rate than another shipper, that led to more stringent legislation. That evil the present amended statute meets in substantially the language of previous legislation. The provision of section 6 is as follows: 'Nor shall any carrier charge or demand or collect or receive a greater or less or different compensation * * * than the rates, fares, and charges which are specified in the tariff filed and in effect at the time."

The above citation amply supports our reasoning in this case, for, as is said in that case, billing clerks and other agents of carriers may easily become experts in the making of errors and mistakes in the quotations of rates to favored shippers. So billing clerks or other agents could defy the law, if they could make contracts for a lower rate than that provided in the official schedule, and by accepting from the shipper a lower rate could give him practically a rebate, and the very evil intended to be overcome by the statute would be in full force.

We therefore recommend that the judgment below be reversed, and this cause remanded for a new trial.

By the Court: It is so ordered.