INTERNATIONAL & G. N. RY. CO. v. CARTER.   (No. 5529.)

(Court of Civil Appeals of Texas. San Antonio. Nov. 10, 1915. On Motion for Rehearing, Dec. 15, 1915.)

1. EVIDENCE ☞83—PLEADING ☞7—INTERSTATE COMMERCE ACT — RATES — PUBLICATION—PRESUMPTION.

Under Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1913, § 8569]) § 6, providing that every common carrier subject to the act shall file with the Commission, and print and keep open to public inspection, schedules showing all the rates, fares, and charges for transportation between different points on its own route, and between points on its own route and points on the route of any other carrier when a through route at a joint rate has been established, also providing that no change shall be made in the rates filed and published except after 30 days' notice to the Commission and to the public duly published, and that the published changes shall be made by printing new schedules, etc., where a railroad printed new schedules, adopting an interstate joint rate for freight as fixed by the Hepburn Act (Act June 29, 1906, c. 3591, 34 Stat. 584), and filed them with the Commission, they being approved, the rates of the new schedule became effective, and it was to be assumed that the publication required by the act was had before the Commission approved the schedules, so that a railroad suing for freight charges under the interstate joint rate need not allege and prove such publication.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 105; Dec. Dig. ☞83; Pleading, Cent. Dig. § 11; Dec. Dig. ☞7.]

2. CARRIERS ☞196—CARRIAGE OF FREIGHT—ACTION FOR CHARGES—BURDEN OF PROOF.

When a railroad by cross-action sought to recover freight charges under an interstate rate, and plaintiff traversed, as required by statute, that the freight was such as to fall within the rate, the burden was on the road to prove the fact.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 879–887; Dec. Dig. ☞196.]

Appeal from Bexar County Court for Civil Cases; Ed. H. Wickes, Special Judge.

Action by C. G. Carter against the International & Great Northern Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Cobbs, Eskridge & Cobbs, of San Antonio, and Wilson, Dabney & King, of Houston, for appellant. Randolph L. Carter, of San Antonio, for appellee.

CARL, J. Appellee sued the appellant for possession of a Ford automobile, tendered $49.20 freight alleged to be due thereon, and sequestered the car. The railway company answered, alleging that a mistake had been made in the rate under the interstate rate as fixed by the Hepburn Act, and in a cross-action sued appellee and the sureties on the sequestration bond for freight in the sum of $131.20; also $25 for storage on the car after it arrived at San Antonio.

The trial was before the court without a jury. Judgment was in favor of appellee; that is, the railway company was given judgment for the freight which had been tendered, and against it on its cross-action. The trial court held that the interstate joint rate under which appellant claimed the right to charge $131.20 was not shown to be in force, and that therefore the rate fixed in the bill of lading—i. e., $49.20—should prevail, because there was no proof that the interstate rate had been published in the manner required by the federal statutes.

There is no proof that this rate would have applied to a car such as appellee shipped, even if it had been in force. But the reason given by the trial court is, in our opinion, correct. We take this from the trial court's findings:

"The court finds that the Interstate Commerce rate pleaded by the defendants was not in force or effect at any time during the shipment involved in this cause, because the rate was not published, and copies of the rate were not furnished to any of the agents, freight offices, or stations of the Mallory Steamship Company, or the defendant railroad company at New York City, or elsewhere. Therefore the contract rate evidenced by the bill of lading was in force and effect, and the defendants wrongfully withheld the automobile from the plaintiff when the tender of $49.20 was made."

It was not shown that this interstate rate had been published as required, and cases construing this act hold that, in order to show a rate effective thereunder, it is necessary to show the filing of the rate with the Commission and the publication of the same. That publication seems to be to deposit copies of the rate with the carrier's agents at the stations where shipments are made. It is not probable that the Congress contemplated that a rate should become effective and the heavy penalties provided attach by the mere filing with the Commission and before any agent knew of the same or had a copy of the rate so that he might be guided thereby. Railway Co. v. Reynolds, 135 S. W. 162; Hunter v. Railway Co., 167 Mo. App. 624, 150 S. W. 733. Justice White said, in

Railway Co. v. Cisco Oil Mill, 204 U. S. 449, 27 Sup. Ct. 358, 51 L. Ed. 562:

"The filing of the schedule with the Commission and the furnishing by the railroad company of copies to its freight offices incontrovertibly evidenced that the tariff of rates contained in the schedule had been established and put in force as mentioned in the first sentence of the section."

We quote this from a North Carolina case:

"The act provides that, in order to establish a lawful schedule of rates, it must not only be thus 'filed with the Commission,' but also 'printed and kept open to public inspection,' and the provision, further on, in regard to changes in the schedule of rates, is that they 'shall not be made, except after thirty days' notice to the public, published as aforesaid.' What, then, is meant by the expression 'published as aforesaid'? It is apparent that these words imply that in making an original schedule 'publication' of some kind was essential to its validity and effectiveness. If we refer again to the first clause of section 6, we find that the schedule must first be filed with the Commission, and then it must be 'printed and kept open to public inspection.' This requires distribution to and among the different stations or depots at which the schedule of rates must have effect, and this is the construction the highest court has placed upon it. * * * The publication intended by the act, therefore, is filing with the agents at the several stations the schedules for public inspection, and this is what has been defined by the court in the Miller Case as 'promulgation and distribution.' Compliance with this requirement is made a condition precedent to the effectiveness of the schedules and the lawfulness of the rate charged thereunder." Virginia Co. v. Railway, 166 N. C. 62, 82 S. E. 1.

It seems to us that it was intended that the rate should become effective "by filing with the Interstate Commerce Commission and depositing printed copies of the filed rate at its stations." And no such publication was shown in this case.

We find nothing else that requires attention, and, since we think the correct result was reached upon the trial, the judgment is affirmed.

## On Motion for Rehearing.

We must confess that we have had great difficulty in arriving at a correct understanding of the Interstate Commerce Act with reference to the requirements necessary to the establishment of interstate rates. This may arise from the fact that, as a general rule, we are only called upon to deal with our Texas statutes, which are much clearer and easier to understand. But this difficulty does not appear to be a trouble peculiar to us; for in searching the opinions of the United States Supreme Court we have not been able to find a definition of what is meant by "publication" as applied to the establishment of such rates. In some it appears to be used almost as synonymous with posting or printing of the schedules, as something which is to take place after the adoption of the schedules by the Interstate Commission. And then again it appears to be the printed agreement of the railways subscribing to the rate and the filing of same with the Commission and furnishing

copies to the offices of the roads, before the rate is adopted.

[1] Section 6 of that act provides:

"That every common carrier subject to the provisions of this act shall file with the Commission created by this act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file, print and keep open to public inspection as aforesaid, the separately established rates, fares and charges applied to the through transportation. The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force. * * * Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected."

It also provides that any railway company subject to the provisions of the act which receives freight from any foreign country or to be carried through the United States to a foreign country "shall also in like manner print and keep open to public inspection, at every depot or office where such freight is received for shipment, schedules showing the through rates," etc. And it is provided that:

"No change shall be made in the rates," etc., "which have been filed and published," etc., "except after thirty days' notice to the Commission and to the public published as aforesaid," etc.; "and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept open to public inspection: Provided, that the Commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified, or modify the requirements of this section in respect to publishing, posting, and filing of tariffs," etc.

And, further:

"The Commission may reject and refuse to file any schedule that is tendered for filing which does not provide and give lawful notice of its effective date," etc.

In T. & P. Ry. Co. v. Cisco Oil Mill, 204 U. S. 451, 27 Sup. Ct. 360, 51 L. Ed. 563, Mr. Justice White says:

"The filing of the schedule with the Commission and the furnishing by the railroad company of copies to its freight offices incontrovertibly evidenced that the tariff of rates contained in the schedule had been established and put in force as mentioned in the first sentence of the section, and the railroad company could not have been heard to assert to the contrary. The requirement that schedules should be posted in two public and conspicuous places in every depot, etc., was not made a condition precedent to the establishment and putting in force of the tariff of rates, but was a provision based upon the existence of an established rate, and plainly had for its object the affording of special facilities to the public for ascertaining the rates actually in force. To hold that the clause had the far-reaching effect claimed would be to say that it was the intention of Congress that the negligent posting by an employé of but one, in-

stead of two, copies of the schedule, or the neglect to post either, would operate to cancel the previously established schedule—a conclusion impossible of acceptance. While section 6 forbade an increase or reduction of rates, etc., 'which have been established and published as aforesaid,' otherwise than as provided in the section, we think the publication referred to was that which caused the rates to become operative; and this deduction is fortified by the terms of section 10 of the act, making it a criminal offense for a common carrier or its agent or shipper or his employé improperly 'to obtain transportation for property at less than the regular rates then established and in force on the line of transportation of such common carrier.'"

Then in the Miller Case, 223 U. S. 599, 32 Sup. Ct. 323, 56 L. Ed. 568, Mr. Justice Van Devanter says:

"Publication and posting in the sense of the act are essentially distinct. This is the import of the provision that the requirements relating to 'publishing, posting, and filing' may be modified by the Commission in special circumstances; for, if publishing included posting, mention of the latter was unnecessary. And from all the provisions on the subject it is evident that the publication intended consists in promulgating and distributing the tariff in printed form preparatory to putting it into effect, while the posting is a continuing act enjoined upon the carrier, while the tariff remains operative, as a means of affording special facilities to the public for ascertaining the rates in force thereunder. In other words, publication is a step in establishing rates, while posting is a duty arising out of the fact that they have been established. Obviously, therefore, posting is not a condition to making a tariff legally operative. Neither is it a condition to the continued existence of a tariff once legally established. If it were, the inadvertent or mischievous destruction or removal of one of the posted copies from a depot would disestablish or suspend the rates, a result which evidently is not intended by the act, for it provides that rates once lawfully established shall not be changed otherwise than in the mode prescribed."

So it appears to us, from a careful reading of many decisions of the United States Supreme Court, that the publication referred to is something that is to be done before the Commission approves the rate. And we think, after further consideration, that it would not be necessary, in order to state a cause of action, for the railroad company to allege and prove that publication was made, because we think that it may fairly be assumed that the Commission ascertained that the publication had been made as required before the schedules were adopted. That would be a defensive matter to be alleged and proved by the defendant. This, of course, is upon the theory that the publication mentioned is the printing of the schedules and filing same with the agents and with the Commission before the rate is adopted or approved by the Commission.

If the publication is something to be done after the rate has been approved by the Commission, we still do not believe that the railways could defeat the operation of the rate by failing or refusing to make such publication as is required. It is true that they might subject themselves to criminal prosecution for failing so to do. But that would not prevent the rate becoming effective; for

the law makes a failure to comply a mere misdemeanor, and it is not probable that Congress intended that the law could thus be rendered nugatory by the mere payment of a small fine. So we conclude that, when the schedules are printed and filed with the Commission, and by it approved, such rates become effective, and that we may assume that such publication was had before the Commission approved the same. Therefore we modify the original opinion so as to accord with this view.

[2] But, assuming that the interstate rate was in effect, still the railway company wholly failed to prove that the freight in this case was such as fell within its terms. The allegations of the petition or cross-action of the railway on that point was traversed as required by our statutes, which put the company upon proof that this car fell within that rate. And this was not done.

For this reason, the motion will have to be overruled.