**NATIONAL MOTOR FREIGHT TRAF-FIC ASSOCIATION, Inc., et al., Plaintiffs,**

v.

**UNITED STATES of America et al., Defendants.**

Civ. A. No. 1911–66.

United States District Court
District of Columbia.
May 15, 1967.

Bryce Rea, Jr., Washington, D. C., for plaintiffs.

Betty Jo Christian, Washington, D. C., for defendants, the United States and Interstate Commerce Commission.

Arthur A. Arsham, New York City, for intervening defendants, The National Small Shipments Traffic Conference, Inc., and Drug and Toilet Preparation Traffic Conference.

John H. Caldwell, Houston, Tex., for intervening defendant, The National Industrial Traffic League.

Before BURGER and McGOWAN, Circuit Judges, and SIRICA, District Judge.

## OPINION

McGOWAN, Circuit Judge: ·

Plaintiffs and intervening plaintiffs, who are associations of motor freight carriers and freight forwarders subject to regulation by the Interstate Commerce Commission, seek nullification of the Commission's action in establishing an informal procedure for the restoration to shippers of past charges which are currently agreed by the carrier and shipper to have been illegal. Certain shippers' associations have intervened as party defendants with the Commission and the United States. All parties have stipulated that we should dispose of the case without evidentiary hearing and upon the pleadings, briefs, and oral arguments. The stipulation also identified the issues in the case as four in number: (1) The standing of the complainants to seek relief, (2) the ripeness of the Commission's action for review, (3) the statutory authority for that action, and (4) the reach of the Administrative Procedure Act with respect to it.

We have concluded, in respect of the first two of these issues, that plaintiffs are rightfully before us and in due season. We do not reach the third, because we have resolved the fourth in

favor of the applicability of Section 4 of the APA. Since any effort at compliance with Section 4 is expressly disclaimed by the Commission, we hold that the complainants are entitled to the relief they seek.

I

This case has its roots in T.I.M.E., Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959), and the Congressional response to that decision. The Supreme Court there held that there was neither a statutory nor a common law right in the shipper by motor freight to assert the illegality of past charges under legally effective tariffs, either to recover allegedly excessive charges already paid or to defend against efforts to collect at the filed rate for service rendered under it. In reaching this result, the Court was strongly motivated by the circumstance that Congress had omitted from the Motor Carrier Act of 1935 the grant of reparations power to the Commission which it had made in the case of the railroads and water carriers.

The Court did not, however, merely recognize the undisputed lack of a solely statutory administrative proceeding for reparations of past motor carrier rates. It proclaimed as well a legislative purpose that there should be no common law right to litigate past rates in a judicial setting.[1]

*T.I.M.E.* set off a swirl of legislative activity which issued in essentially identical amendments to Parts II and IV of the Interstate Commerce Act in 1965.[2] these operated to recognize a judicially-enforceable right to reparations in respect of past charges. Congress continued to withhold from the Commission any power to compel reparations by administrative action, although the scheme of the amendments was such as to vest in the Commission the determination of the issue of whether the rates charged were illegal. In this latter respect, the Congress was, of course, following the pattern which has characterized the procedure followed by courts in entertaining reparations suits against railroads.[3]

1. The relevant statutes are identified and discussed at length in the Court's majority and dissenting opinions, as is the history of reparations proceedings involving rates once effective under the regulatory laws administered by the Commission.

2. Public law 89–170, effective September 6, 1965. Section 6 of this law was as follows:

SEC. 6. (a) Paragraph (2) of section 204a of the Interstate Commerce Act (49 U.S.C. § 304a) is amended to read as follows:

"(2) For recovery of reparations, action at law shall be begun against common carriers by motor vehicle subject to this part within two years from the time the cause of action accrues, and not after, and for recovery of overcharges, action at law shall be begun against common carriers by motor vehicle subject to this part within three years from the time the cause of action accrues, and not after, subject to paragraph (3) of this section, except that if claim for the overcharge has been presented in writing to the carrier within the three-year period of limitation said period shall be extended to include six months from the time notice

in writing is given by the carrier to the claimant of disallowance of the claim, or any part or parts thereof, specified in the notice."

(b) Section 204a of the Interstate Commerce Act (49 U.S.C. § 304a) is amended by redesignating paragraphs (5), (6), and (7) as paragraphs (6), (7), and (8), respectively, and by inserting immediately after paragraph (4) thereof the following:

"(5) The term 'reparations' as used in this section means damages resulting from charges for transportation services to the extent that the Commission, upon complaint made as provided in section 216(e) of this part, finds them to have been unjust and unreasonable, or unjustly discriminatory or unduly preferential or unduly prejudicial."

3. The moving considerations are those customarily subsumed under the concept of primary jurisdiction. See Texas & Pacific Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). Although the majority and the minority in *T. I. M. E.* appeared to read the *Abilene* case differently in terms of whether it negated the existence of a common law right in the courts or merely conditioned the manner of its exercise, both

Not long after these amendments became law, the Commission issued a "Notice" that it had "approved a method by which motor carriers and freight forwarders may be authorized informally to pay reparations to shippers, thus restoring a procedure that was observed as to motor carriers prior to" the *T.I. M.E.* decision. The Commission referred to the new amendments as the predicate of this action, saying that Congress thereby "intended to restore the procedures formerly available to shippers with respect to motor carrier reparations before the decision in the *T.I.M.E.* case, and to extend them to freight forwarders * * *" The restored procedures were described as permitting any shipper to inform the Commission by letter or petition of the details of the shipment, with "evidence and reasons why applicable rates and charges are believed to be unreasonable to extent of sought basis." This "evidence" must include a statement by the carrier that the offending rate has been changed, and an admission that it was unreasonable. Thus, said the Commission, its action "restores informal procedures with respect to uncontested cases in which the carrier is agreeable to making adjustments." [4]

This action was taken by the Commission, and announced to the public,

without prior notice of any kind and without the provision of opportunity to any interested party to be heard with respect to it. After the "Notice" was issued on December 17, 1965, plaintiffs petitioned the Commission for reconsideration. This petition was denied by the Commission in an order served June 9, 1966.

## II

The threshold issues of standing and ripeness are not as separate and distinct as their consecutive enumeration in the stipulation might perhaps imply. They are, at most, variant aspects of the essential question we confront at the outset, namely, have the plaintiffs brought to us a firm and significant determination by the Commission which has a ponderable impact upon interests of substance of the plaintiffs and which can meaningfully be considered by us without awaiting its application to the facts of a particular case? We think they have, and that, conversely, a turning away of the plaintiffs at this juncture would not comport with the values implicit in the rule-making requirements of the Administrative Procedure Act. It will not do for the courts to invite greater resort by the agencies to general rule-making,[5] and at the same

recognized the longstanding practice of the courts to defer to the Commission in passing upon the legality of a filed rate. See, e. g., Mitchell Coal & Coke Co. v. Pennsylvania R.R., 230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472 (1913). The Commission itself had assumed the right of a shipper by motor carrier to sue in court for reparations in respect of past rates, with reference being made by the court to the Commission of the question of the legality of the rate in question. Bell Potato Chip Co. v. Aberdeen Truck Line, 43 M.C.C. 337 (1944) ; Barrows Porcelain Enam. Co. v. Cushman Motor Deliv. Co., 11 M.C.C. 365 (1939). The Commission was, of course, disabused of this notion by *T. I. M. E.*, but the 1965 amendments appear to have made this particular wheel come full circle.

4. The Commission has represented to us that, for some eleven years preceding *T. I. M. E.*, it provided an informal

procedure, substantially identical with that under attack here, for the voluntary return by motor carriers of past charges conceded by them to be illegal. This reflected the Commission's belief that motor freight shippers could seek reparations in court, with ancillary determination by the Commission of the issue of rate legality. The Commission conceived of this informal procedure as paralleling that observed in the railroad field for many years, and as eliminating a useless step (i. e., filing suit) in those cases where the parties were in agreement as to the refund to be paid.

5. See, e. g., American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966) and Pacific Coast European Conference v. FMC, D. C.Cir., 376 F.2d 785, decided March 31, 1967.

time to rebuff at the courthouse door those affected by the rule who seek an appropriate, albeit early, test of its validity.

■ The interest of the plaintiffs is clear. As organizations they have standing to pursue the concerns of their members. National Motor Freight Traffic Ass'n v. United States, 372 U.S. 246, 247, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963). And those concerns seem to us neither insubstantial nor wholly sheltered from adversities latent in the Commission's action. The Commission's principal contention on this matter of aggrievement is that plaintiffs overlook the limitation of the new procedure to the case where the formerly effective rate has been changed. It insists that this means that plaintiffs will have had an opportunity to protest the filing of the altered rate and to be heard in opposition to it. Therefore, concludes the Commission, plaintiffs cannot pitch their present claim of aggrievement upon the loss of a chance to defend a rate which they believe to be reasonable.

■■ The difficulty with this position, as plaintiffs pertinently point out, is that, when a new and lower rate is filed, it may be within a range of reasonableness which comprehends the old rate as well. As to a competing carrier, the issue presented by the new filing is whether the new rate is too low, not whether the old was too high; and approval by the Commission of the new rate does not embrace a determination by it that the old one was illegal. But it is this latter determination which is precisely the object of the new procedure. Where shipper and carrier agree that an old rate was illegal, the mere meeting of their minds does not make it so; and there is very real danger that, rightly or wrongly, their agreement may be suspect as involving a discriminatory rebate. This is why that agreement is to be subjected to Commission scrutiny under the informal procedure; and we have the Commission's own word for it, in its order denying plaintiffs' petition for reconsideration, that "each applica-

tion will be thoroughly investigated to make certain that the applicable rates were in fact unlawful under the principles of the Act." Thus, a rate filed by Carrier A, which it has not changed, may, upon an application under the informal procedure by Carrier B who has filed a new and lower rate, be found by the Commission to be illegal. And all this would be without notice to Carrier A or any provision for its being heard on the question. It does not take too much familiarity with the realities of competitive transportation to believe that, although it be assumed for the moment that the informal procedure is within the Commission's power, plaintiffs have at least the kind of interest which entitles them to mount in court a challenge to the existence of that power.

As to the timeliness of this attack, Judge Friendly has recently illumined the relevant considerations with the usual perceptivity which he brings to bear in this field. In Toilet Goods Ass'n Inc. v. Gardner, Secretary of Health, Education and Welfare, 360 F.2d 677, 684–685 (2d Cir. 1966), he said:

The appropriateness of passing judgment on the validity of an administrative regulation prior to its application to particular facts depends on such factors as how far the rule represents the definitive position of the agency and the extent to which the challenge raises a clearcut legal issue susceptible of judicial solution without reference to fact variables arising in its implementation. Cf. Northeast Airlines, Inc. v. CAB, 345 F.2d 662, 664 (1 Cir. 1965). Review might be considered premature where an agency rule had not received substantially as full consideration in its formulation as it would have in subsequent application, or where future experience would be likely to result in significant modifications as to its precision or scope. Judicial determination might also be deemed inappropriate where the controversy over the rule did not present a legal issue that a court was qualified

to resolve without reference to factual determinations more effectively made by the agency familiar with day to day administration. * * *

The application of factors of this nature to the case at hand undermines any claim of lack of ripeness. The Commission's action is nothing if not definitive, nor is there any flavor of tentativeness to be observed in the terms or manner of its promulgation. Indeed, the Commission emphasizes repeatedly that it is not experimenting with anything new, but only reinstating a procedure which it asserts was once employed for over a decade without injury to the public interest. This does not at all suggest that the legal issue of its power in the premises is likely to be looked upon differently by the Commission in the light of "day to day administration." Neither is our grasp of the typical factual setting of that issue so limited as to hinder its judicial resolution. If a general rule promulgated by an agency is ever to be the focus of judicial review prior to its application in a particular case, this would appear to be a peculiarly appropriate occasion for it. We hold that plaintiffs are properly before us, and direct our attention to the bases of their claim.

### III

In its order denying plaintiffs' petition for reconsideration, the Commission rejected the claim of failure to comply with Section 4 of the APA "since the notice and action of the Commission falls within the exemption provision" of that Section. Plaintiffs press upon us that this is not so; and thus we have squarely before us the question of the proper construction of the exempting language of

Section 4 in relation to the Commission action under attack.

■■ The relevant language of Section 4(a) (5 U.S.C. § 1003(a)) is set forth in the margin.[6] The Commission casts its argument in the form that the "right to reparations is conferred by statute, and the notice itself confers no new substantive right on any party * * * it merely provides a procedure which may be voluntarily used" to settle reparation claims. Of course, whether Congress has conferred by statute any "right to reparations" whatsoever through purely administrative means is the precise issue raised by plaintiffs in their submission on the merits. We have, as indicated above, not thought it necessary to reach the merits in this case because, even if we were to decide that the Commission is not foreclosed by any Congressional or other restraint from doing what it did, we would still be of the view that Section 4 was applicable and should have been observed. That agency action falls within the permissible scope of statutory authority does not alone answer the question of the applicability of Section 4.

■ It is, in any event, clear that Congress did not in express terms in the 1965 amendments provide more than a judicial avenue to reparations. It may be that, properly viewed, this limitation did not proscribe the informal and voluntary administrative procedures at issue here, but this assumed authority on the part of the Commission to act does not mean that its action is so insignificant in nature and impact as to fall outside the rule-making requirements of Section 4.

6. NOTICE.—General notice of proposed rule making shall be published in the Federal Register (unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law) and shall include (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. Except where notice or hearing is required by statute, this subsection shall not apply to interpretative rules, general statements of policy, rules of agency organization, procedure, or practice, or in any situation in which the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

The reverse would, indeed, appear to be true. Even assuming the power, the decision by the Commission to make its administrative processes and expertise available for a regular course of finding formerly effective rates to be illegal in order that rebates may be made without violating the statutory prohibitions upon discrimination,—that decision, we repeat, is hardly a routine determination in the discharge of the Commission's important functions, as witness the critical importance which the Commission itself now attributes to this device. It is scarcely the same as fixing the time within which pleadings must be filed. Compare Ranger v. FCC, 111 U.S.App. D.C. 44, 294 F.2d 240 (1961). Nor is it simply a general pronouncement of the broad policy considerations which will motivate the Commission as it addresses itself to its appointed tasks.

It is, rather, a specific and definite commitment by the Commission of its energies and authority to an adjudication of the propriety of a return by a carrier to a shipper of a charge theretofore collected by the former for its services. Such an adjudication may, as we have seen, have palpable effects upon other carriers and shippers; and it is no answer to say that it creates no substantive rights because it is provided by the Commission only for those who voluntarily choose to use it. A right to avail oneself of an administrative adjudication of this kind does not become trivial simply because it is optional.

The Commission has been at some pains throughout its presentation to us to emphasize the importance of having informal settlement procedures available as an adjunct to the judicial reparations scheme which Congress has now explicitly provided for the first time in Parts II and IV of the Act. The Commission was, however, under no injunction from Congress to provide such a supplement. It would not have been derelict in any way vis-a-vis Congress if it had concluded to act only in the ancillary role explicitly defined in the amendments to the Act. Its decision to anticipate voluntary settlements before resort to the courts, and to make a rate determination for the convenience and protection of the agreeing parties, was not a necessary consequence of the change in the law. Whether the Commission should have taken that decision at all, and, if so, what the precise form and scope of the procedure should be, were questions suitable for exploration in formal rule-making. The Commission now assures us that what it did was important to the proper implementation of the statutory scheme for judicial reparations. But that very quality of importance—to the industry and to the public—is what lies at the base of Section 4 of the APA and which informs the Congressional purpose in that law to expose proposed agency action by general rule to the test of prior examination and comment by the affected parties.

The characterizations "substantive" and "procedural"—no more here than elsewhere in the law—do not guide inexorably to the right result, nor do they really advance the inquiry very far. The word "substantive" nowhere appears in Section 4(a), Note 6 supra; and the Commission's argument to us appears not to derive so much from the reference there to "rules of agency organization, procedure, or practice" as it does from the following characterization of Sections 4(a) and (b) of the APA contained in the Attorney General's Manual on the Administrative Procedure Act 30 (1947):

> *Section 4(a) and (b) applicable only to substantive rules.* The last sentence of section 4(a) exempts from the requirements of section 4(a) and (b), unless otherwise required by statute, "interpretative rules, general organization, procedure, or practice". Thus, the rules of organization and procedure which an agency must publish pursuant to section 3(a) (1) and (2) are not ordinarily subject to the requirements of section 4(a) and (b). The further exemption of "interpretative rules" and "general statements of policy" restricts the application of section 4(a) and (b) to substantive

rules issued pursuant to statutory authority.[3] See Senate Comparative Print of June 1945, p. 6 (Sen.Doc. p. 19).

If the test be whether the rule is, as the Manual says, one which is issued by an agency "pursuant to statutory authority and which implement[s] the statute," it is not without significance that the Commission dropped its informal procedure with the decision in *T.I.M.E.* and resumed it only after Congress amended the Act. However it be labelled, the Commission took a significant step in the implementation of the newly-conferred statutory judicial remedy for reparations when it instituted the procedure here in question. It was one which, in our view, was within the purview of the Congressional prescription of rule-making requirements contained in Section 4.

Judgment will be entered in accordance with this opinion.

3. In this connection, the following working definitions are offered:

*Substantive rules*—rules, other than organizational or procedural under section 3(a) (1) and (2), issued by an agency pursuant to statutory authority and which implement the statute, as, for example, the proxy rules issued by the Securities and Exchange Commission pursuant to section 14 of the Securities Exchange Act of 1934 (15 U.S.C. § 78n). Such rules have the force and effect of law.