**AKRON, CANTON & YOUNGSTOWN RAILROAD COMPANY, et al.,**
Plaintiffs,

and

**Freight Forwarders Tariff Bureau, Inc., et al.,** Intervening Plaintiffs,

v.

**UNITED STATES of America**

and

**Interstate Commerce Commission,** Defendants,

and

**National Industrial Traffic League,** Intervening Defendant.

**Civ. A. No. 72–1273–M.**

United States District Court,
D. Maryland.

Jan. 14, 1974.

---

51. Letter to the Honorable John J. Sirica from John Doar, Esq., dated March 12, 1974, and filed in Misc. 74–21.

Peter J. Hunter, Roanoke, Va., and Albert W. Laisy, Baltimore, Md., for plaintiff railroads.

Fenton L. Martin, Baltimore, Md., and Clarence W. Vandegrift, New York City, for intervening plaintiffs.

George Beall, U. S. Atty., and Andrew Jay Graham, Asst. U. S. Atty., Baltimore, Md., for defendant United States.

Theodore Compton Knappen, Washington, D. C., for defendant Interstate Commerce Commission.

William J. Little, Baltimore, Md., and John K. Maser, III, Washington, D. C., for intervening defendant.

Before BRYAN, Circuit Judge, and THOMSEN and MILLER, District Judges.

JAMES R. MILLER, Jr., District Judge.

This is an action to enjoin permanently an order of the Interstate Commerce Commission (ICC). The plaintiffs, consisting of most, if not all, of the major railroads in the United States, are required by 49 U.S.C. § 6 to publish or cause to be published schedules of rates or tariffs for the transportation of passengers or property in interstate and foreign commerce. Intervening plaintiffs, members of Freight Forwarders Tariff Bureau, Inc., are required by 49 U.S.C. § 1005 to publish or cause to be published schedules of rates or tariffs for their services relating to the transportation of property in interstate commerce. The defendants are the ICC and the United States. The National Industrial Traffic League, an organization of shippers, has intervened as a defendant. In their respective complaints plaintiffs and intervening plaintiffs seek a permanent injunction against the enforcement of ICC regulations which were entered August 28, 1972 (see pages 18550 et seq. of Federal Register, Sept. 13, 1972, Vol. 37, No. 178), namely, 49 C.F.R.—Transportation, Chapter X—Interstate Commerce Commission, Subchapter D—Tariffs and Schedules, Part 1300—Freight Schedules, Railroads, Section 1300.30; Part 1303—Passenger Service Schedules; Rail and Water Carriers, Section 1303.36; Part 1309—Tariffs and Classifications of Freight Forwarders, Section 1309.5.

The challenged regulations in essence require the plaintiffs, the intervening plaintiffs, and certain other carriers of freight to transmit to subscribers copies of proposed new tariffs prior to the time that they are filed with the ICC.

Plaintiffs' challenge to the above order raises three basic issues: (1) Whether the ICC had the power to issue the above order; (2) Whether the procedures for rulemaking set forth in the Administrative Procedure Act apply to the promulgation of the above order; and (3) Whether the petitions for reconsideration filed by plaintiffs with the ICC satisfied the procedural requisites of the Administrative Procedure Act.

I. *Whether the ICC had the power to issue the order entered on August 28, 1972.*

The dispute with respect to this issue concerns the meaning of the term "published" as set forth in 49 U.S.C. § 6(6) [1] and 49 U.S.C. § 1005(b) [2] relating to tariff schedules. These sections autho-

---

[1]. 49 U.S.C. § 6(6) reads as follows:

"(6) The schedules required by this section to be filed shall be published, filed, and posted in such form and manner as the Commission by regulation shall prescribe; and the Commission is authorized to reject any schedule filed with it which is not in accordance with this section and with such regulations. Any schedule so rejected by the Commission shall be void and its use shall be unlawful."

[2]. 49 U.S.C. § 1005(b) reads in pertinent part as follows:

"(b) . . . The Commission shall by regulations prescribe the form and manner in which the tariffs to which this section applies shall be published, filed, and posted; and the Commission is authorized to reject any tariff filed with it which is not in accordance with this section and with such regulations. Any tariff so rejected by the Commission shall be void and its use shall be unlawful."

**1234**

rize the ICC to prescribe by regulation the "form and manner" in which tariff schedules of the plaintiff railroads and the plaintiff freight forwarders respectively are to be ". . . published, filed, and posted . . . ."

The railroad plaintiffs argue that the meaning of the word "published" as it applies to them in 49 U.S.C. § 6(6) is synonymous with the word "posted" therein and that both words refer to the distribution of tariff schedules to railroad agencies for posting and public inspection at the railroad stationhouse door. For this proposition, a number of old cases are cited, among them Kansas City So. Ry. v. Albers Comm. Co., 223 U.S. 573, 594, 32 S.Ct. 316, 56 L.Ed. 556 (1912); United States v. Miller, 223 U. S. 599, 604, 32 S.Ct. 323, 56 L.Ed. 568 (1912); Texas & Pac. Ry. v. Cisco Oil Mill, 204 U.S. 449, 451, 27 S.Ct. 358, 51 L.Ed. 562 (1907); Hunter v. St. Louis & S. F. R. Co., 167 Mo.App. 624, 150 S. W. 733 (1912); International & G. N. Ry. Co. v. Carter, 180 S.W. 663 (Tex. Civ.App.1915); Virginia-Carolina Peanut Co. v. Atlantic Coast R. R., 166 N.C. 62, 82 S.E. 1 (1914), and New York, N. H. & H. R. Co. v. Salter, 104 Conn. 728, 134 A. 220 (1926).

■ In the *Miller* case, however, in discussing the meaning of the word "publishing" as it was used in what is now 49 U.S.C. § 6(3), the Supreme Court held that "posting" and "publishing" are essentially distinct. The Court said at 223 U.S. page 604, at 32 S.Ct. page 325:

"This is the import of the provision that the requirements relating to 'publishing, posting, and filing' may be modified by the Commission in special circumstance, for if publishing included posting, mention of the latter was unnecessary. And from all the provisions on the subject it is evident that the publication intended consists in promulgating and distributing the tariff in printed form, preparatory to putting it into effect, while the posting is a continuing act, enjoined upon the carrier, while the tariff remains operative, as a means of affording special facilities to the public for ascertaining the rates in force thereunder."

Nor is the meaning of the word "published" in § 6(6) limited to a process of printing and distribution of rate schedules to the stationhouses or depots where the schedules were later to be posted. Although several of the old cases cited by the plaintiffs might tend to indicate such a meaning for the word in § 6(3), these cases were decided prior to the advent of modern modes of transportation and communication and prior to the 1940 revisions to the Act.

In 1940, the ICC Act was rewritten in substantial part. Sept. 18, 1940, c. 722, Title I, § 8, 54 Stat. 910. While the language of § 6(1) and § 6(3), which was the subject of the interpretations of the old cases cited by the plaintiff railroads, was retained in substantially its original form, Congress added § 6(6). In § 6(6), the word "published" is not limited or restricted by any qualifying words whereas in § 6(3) the word "published," as it initially appears in that section, is limited by the qualifying words "as aforesaid," referring apparently to the posting and tariff schedule distribution process described in § 6(1) and § 6(2). By 1940, with the advent of trucks and vastly improved mail, telephonic and other forms of communication, the era had ended in which shippers walked down to the local railroad depot to look at the freight rates posted at the stationhouse door as was the procedure when the precursers of §§ 6(1), 6(2), and 6(3) were enacted. As would seem reasonable, Congress by enacting § 6(6) in broad language without limiting the use of the word "published" to its prior usage, gave broad authority to the ICC to prescribe the *"form* and *manner"* in which the required tariff schedules would be "published," as well as filed and posted, in order to meet changing conditions and times.

In 1942, the services of freight forwarders were subjected to ICC regula-

tion by Congress, and the ICC was given authority to prescribe the "form and manner" in which the required tariff schedules were to be "published, filed and posted." May 16, 1942, c. 318, § 1, 56 Stat. 287. This statute is now codified as 49 U.S.C. § 1005(b), and its operative language relevant to the present discussion is substantially the same as that in 49 U.S.C. § 6(6).

█ The practice of mailing or otherwise delivering tariff schedules to subscribers has been extant for decades according to the pleadings herein. This practice is certainly an integral part of the process utilized by the plaintiffs for publishing their required schedules to prospective shippers and others. Section 6(6) and its counterpart, § 1005(b), authorize the regulation by the ICC of the "form and manner" of publication of the required tariff schedules. Since the subject of the new regulations is one method utilized by plaintiffs for the publication of their tariff schedules, the regulations, dealing with the "form and manner" of tariff schedule publication, are authorized by § 6(6) and § 1005(b).

Even if the authority of the ICC were not so explicit, the Supreme Court has upheld the promulgation of rules by administrative agencies based upon generalized statutory grants of regulatory authority less specific than the one here.

In American Trucking Associations, Inc. v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953), the Supreme Court upheld the ICC's promulgation of rules effectively abolishing a practice known as "trip-leasing." After reviewing the abuses the rules were intended to stop, the Court noted that (*id.* at 311–312, 73 S.Ct. at 315):

> "So the rules in question are aimed at conditions which may directly frustrate the success of the regulation undertaken by Congress. Included in the Act as a duty of the Commission is that '[t]o administer, execute, and enforce all provisions of this part, to make all necessary orders in connection therewith, and to prescribe rules,

regulations, and procedure for such administration'. § 204(a)(6). And this necessary rule-making power, coterminous with the scope of agency regulation itself, must extend to the 'transportation of passengers or property by motor carriers engaged in interstate or foreign commerce and to the procurement of and the provision of facilities for such transportation,' regulation of which is vested in the Commission by § 202(a). See also § 203(a)(19)."

\* \* \* \* \* \*

> "We hold then that the promulgation of these rules for authorized carriers' falls within the Commission's power, despite the absence of specific reference to leasing practices in the Act. See General Tank Car Corp. v. Terminal Co., 308 U.S. 422, 432 [60 S.Ct. 325, 84 L.Ed. 361]. The grant of general rule-making power necessary for enforcement compels this result."

The plaintiffs have argued that the term "published" in § 6(6) has not in specific and absolutely unambiguous terms been related to the regulation of methods of distribution of the tariff schedules to shippers as opposed to the methods of their distribution to railroad depots for later posting. In American Trucking Associations, Inc. v. United States, the Court rejected the very same statutory construction approach espoused by the plaintiffs here, stating (*Id.* at 309–310, 73 S.Ct. at 314):

> "Our function, however, does not stop with a section-by-section search for the phrase 'regulation of leasing practices' among the literal words of the statutory provisions. As a matter of principle we might agree with appellants' contentions if we thought it a reasonable canon of interpretation that the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or do include specific consideration of every evil sought to be corrected. But no great acquaintance with practical affairs is required to know that prescience, either in fact

or in the minds of Congress, does not exist. National Broadcasting Co. v. United States, 319 U.S. 190, 219–220 [63 S.Ct. 997, 1010, 1011, 87 L.Ed. 1344]; Phelps Dodge Corp. v. Labor Board, 313 U.S. 177, 193–194 [61 S.Ct. 845, 852, 85 L.Ed. 1271]. Its very absence, moreover, is precisely one of the reasons why regulatory agencies such as the Commission are created, for it is the fond hope of their authors that they bring to their work the expert's familiarity with industry conditions which members of the delegating legislatures cannot be expected to possess. United States v. Pennsylvania R. Co., 323 U.S. 612 [65 S.Ct. 471, 89 L.Ed. 499]."

The same rationale was expressed by the Supreme Court in American Trucking Associations, Inc. v. Atchison, Topeka & Santa Fe Ry. Co., 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967). In that case ICC rules, requiring railroads to make available flat car service to motor carriers to the same extent as such service was available to the general shipping public, were upheld, in the absence of an express command in the statute that the service be furnished to motor carriers which competed with the railroads. The Court reasoned that the general policy of the statute requiring the railroads to serve the public in a reasonable and non-discriminatory manner justified the exercise of authority by the ICC involved in that case. See also United States v. Pennsylvania R. Co., 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499 (1945).

In view of the Supreme Court's rationale as set forth in the cases above, the ICC's statutory power to regulate the manner in which carriers publish their tariffs plainly is a sufficient basis for the promulgation of rules with regard to the procedures used in one of the carriers' primary methods of publication, the mailing or other transmittal of tariffs to subscribers.

II. *Whether the procedures for rulemaking set forth in the Administrative Procedure Act (APA) apply to the promulgation of the order entered on August 28, 1972.*

The rulemaking procedures of Section 4 of the Administrative Procedure Act (5 U.S.C. § 553) are applicable to proceedings before the ICC in appropriate cases. United States v. Florida East Coast Railway Company, 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); United States v. Allegheny-Ludlum Steel, 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). The question in this case is whether the regulations promulgated pursuant to the August 28, 1972 order come within the exceptions set forth in 5 U.S.C. §§ 553(b)(A) or (B) to the usual rulemaking procedures.

The Administrative Procedure Act provides in pertinent part as follows:
"§ 553

"(b) * * *

"Except when notice or hearing is required by statute, this subsection does not apply—

"(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

"(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."

■ No notice or hearing is required by the ICC Act relating to the regulation of the "form and manner" in which tariff schedules are to be published. Therefore, any exemption from the rulemaking procedures mandated by § 553 must be found in subsections (A) or (B) thereof.

■ The Commission argues that the regulations are "rules of agency organization, procedure, or practice." The regulations provide in essential part as follows:

"(a)(1) Except as otherwise authorized in subparagraphs (2) and (4),

copies of each new tariff, supplement, and loose-leaf page must be transmitted to subscribers thereto not later than the time the copies for official filing are transmitted to this Commission. The letter of transmittal accompanying the copies to the Commission must contain the following certification:

"I hereby certify that I have on or before this day sent copies of the publication(s) listed hereon to all subscribers thereto by (here state the exact method or combination of methods of transmission used, such as messenger service, express service, U.S. Postal Service, etc. If the U.S. Postal Service, the exact class or combination of class of mail used must be stated).

_____
Signature of person
transmitting publication(s)

_____
Date
* * * * * *

"(5) Expedited service when transmitting copies of publications must be provided to any subscriber requesting it. The cost of this service may be passed on to the subscriber.

"(6) Carriers and agents shall furnish a copy of any of their tariffs to any person upon reasonable request therefor, free or at a reasonable price, not to be greater than that charged subscribers.

"(7) As used herein, the term 'subscriber' means a party who voluntarily or upon reasonable request is furnished copies of a particular tariff or tariffs and amendments thereto (including reissue thereof) by the publishing carrier or agent. The term does not, however, pertain to request for a copy or copies of a tariff without a request for future amendments thereto. A reasonable charge may be made for the subscription."

The new regulations, upon analysis, require the following: (1) No later than the time that a tariff is mailed or otherwise delivered to the ICC for filing

as required by 49 U.S.C. §§ 6(1), 6(3) and other applicable sections, the carrier involved must have "transmitted" the tariff to subscribers; (2) the covering letter to the ICC enclosing the tariff for filing must have a certificate of service on it, certifying that the tariff has been sent to all subscribers and enumerating the modes of transmittal; (3) if a subscriber wants a faster method of transmittal of a tariff than is normally provided, such "expedited" method must be provided to that subscriber by the carrier at cost; (4) a carrier must provide, without charge or at a price not to exceed that charged ordinary subscribers, a copy of any of its tariffs to anyone reasonably requesting it; (5) a reasonable charge may be made by a carrier for copies of tariffs voluntarily or upon reasonable request sent to interested parties; (6) although it is not expressly so stated in the regulations, it is permissible to infer that the ICC could refuse to accept a tariff for filing which did not have the required certificate. Of these six duties or rights established by the regulations, only two, i. e. (2) and (6), relate to "agency . . . procedure, or practice" as opposed to procedures to be followed by carriers or others.

Three major cases are cited by defendants as illustrative of the law in this field. In Ranger v. FCC, 111 U.S. App.D.C. 44, 294 F.2d 240 (1961), the challenged rule was one establishing a cut-off date for application to the Federal Communications Commission for a broadcasting license. No substantive rights were actually involved by the rule itself in that case, since it merely established a date by which an application with the Commission had to be filed in order to be considered by the Commission. This clearly involved only "agency . . . procedure, or practice" even though a failure to observe the rule might as a result lead to the loss of a substantive right to be considered for the license.

In Kessler v. FCC, 117 U.S.App.D.C. 130, 326 .F.2d 673 (1963), the rule chal-

lenged was a temporary freeze on the filing of applications pending completion of new rules relating to licenses for radio broadcast stations. Again, the immediate direct effect of this rule was only on "agency . . . procedure, or practice." It imposed no burden or duty on persons outside the Federal Communications Commission but merely stated that applications, instead of being received by the Commission at any time, would as a matter of agency procedure not be received by the Commission until after new rules had been considered.

The most recent case in this field is Commonwealth of Pennsylvania v. United States, 361 F.Supp. 208 (M.D.Pa. 1973), aff'd, 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.2d 310 (Nov. 12, 1973). There the new rules of the ICC related (1) to the creation of a rebuttable presumption that an abandonment of a branch line of a railroad should be permitted where in the immediately preceding year less than 34 carloads per mile were carried over the branch line and (2) to the circumstances under which a short form of application for the abandonment of a branch railroad line could be filed with the ICC. The three-judge court held that the effect of the challenged rules was ". . . only to set guidelines for determination [by the ICC] of the necessity of formal proceedings or hearings." (Id. at 214). Accordingly, it was determined that the rules were merely changes in "agency . . . procedure, or practice" and not subject to the rulemaking requirements of § 553.

Prior to the 1940 revisions to the Act, it was not considered by the Commission that the Interstate Commerce Act made provision for the furnishing of copies of tariffs to shippers and others. Phoenix Horse Shoe Co. v. A. T. & S. F. Ry., 142 I.C.C. 663, 664 (1928); Haas & Co. v. Director General, 98 I.C.C. 619, 622–623 (1925). While we have held in part I of this opinion that the ICC has the statutory authority to adopt regulations of the type involved here as a result of the 1940 and subsequent revisions to the

Act, it is undisputed that no previous regulation has required common carriers to furnish copies of tariffs to shippers or others in any manner than by posting them at depots, filing them at the Commission offices, and making them available for inspection at certain places. Indeed, the Commission argues here that even the presently disputed regulations do not require the carriers to do so but merely require that the voluntarily adopted additional methods of notification to shippers of the tariff schedules be utilized by the carriers in a reasonable and non-discriminatory manner.

If, in fact, the ICC is not attempting to require the plaintiffs to conduct a mass publication and distribution of their tariffs as a prerequisite to filing them with the Commission, then the regulations deal, not with "agency . . . procedure, or practice," but with the substantive burdens and duties of the plaintiffs in carrying out a voluntary act. On the other hand, if the regulations do, as a practical matter if not literally, require for the first time that the plaintiffs furnish directly to shippers and others copies of the tariff schedules as a prerequisite to filing them with the Commission, such radical departure from prior practice, while perhaps justified, appears to go far beyond a mere matter of "agency . . . procedure, or practice."

In Texaco, Inc. v. Federal Power Commission, 412 F.2d 740, at 744 (3rd Cir. 1969), it was stated:

"Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself *before* establishing rules and procedures which have a *substantial impact* on those regulated. See Pacific Coast European Conference v. United States, 350 F.2d 197, 205 (9th Cir.), cert. den. 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965)." (Emphasis supplied).

Similarly, a three-judge court in National Motor Freight Traffic Assn. v. United States, 268 F.Supp. 90 (D.D.C.

1967), aff'd, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968), held that a substantial impact imposed upon an industry by a so-called procedural rule exempts it from the exception created by § 553(b)(A). The court said, "the characterizations 'substantive' and 'procedural'—no more here than elsewhere in the law—do not guide inexorably to the right result, nor do they really advance the inquiry very far." 268 F.Supp. at 96. In that case the ICC had adopted, without rulemaking procedures required by the Administrative Procedure Act, a method by which motor carriers and freight forwarders would be authorized informally to pay reparations to shippers. The court found this to be substantive, not procedural, and nullified the Commission's action, even though the method authorized by the Commission was a voluntary one.

> "Such an adjudication may, as we have seen, have palpable effects upon other carriers and shippers; and it is no answer to say that it creates no substantive rights because it is provided by the Commission only for those who voluntarily choose to use it. A right to avail oneself of an administrative adjudication of this kind does not become trivial simply because it is optional." (*Id.*).

In the case of Pharmaceutical Manufacturers Association v. Finch, 307 F. Supp. 858 (D.Del.1970), the Commissioner of Food and Drugs had issued, without following the procedures of the Administrative Procedure Act, a regulation requiring drug manufacturers, when applying for approval of a product as proper for marketing, to produce substantial evidence of the effectiveness of the product, with such substantial evidence required to be gathered in accordance with detailed criteria for "adequate and well-controlled clinical investigations." The Commissioner labeled the regulations "procedural," and so they were in the same sense as in the case at bar, in that they established procedures prerequisite to filing with the agency involved. Nevertheless, in rejecting the contention that the regulations were procedural the court said:

> "Attempting to provide a facile semantic distinction between an 'interpretative and procedural' rule on the one hand and a 'substantive' rule on the other does little to clarify whether the regulations here involved are subject to the notice and comment provisions of Section 4 of the Administrative Procedure Act. Rather that determination must be made in the light of the basic purpose of those statutory requirements. The basic policy of Section 4 at least requires that when a proposed regulation of general applicability has a substantial impact on the regulated industry, or an important class of the members or the products of that industry, notice and opportunity for comment should first be provided." 307 F.Supp. 858, 863.

While it is true, as defendants have pointed out, that the authority of the ICC granted under 49 U.S.C. § 6(6) has been said to be "procedural regulation," North Carolina Natural Gas Corp. v. United States, 200 F.Supp. 745 at 750 (D.Del.1961), the case in which these words appear did not relate to the issue of the applicability of the rulemaking procedures of Section 4 of the Administrative Procedure Act to a regulation issued under § 6(6). Instead that case dealt with the issue of whether the lawfulness *per se* of tariff rates could be decided by the ICC under the authority of § 6(6), and the court there properly held that § 6(6) dealt, in that context, only with procedural regulation of the publication, filing and posting of tariff rates as opposed to the reasonableness or lawfulness of the tariff rates themselves. That case is no authority for the proposition that every regulation of the ICC under § 6(6) is a matter of "agency . . . procedure, or practice," exempt from the strictures of the rulemaking process by virtue of § 553(b)(A).

Sometimes the line is not glaringly bright between a regulation establishing a matter of practice or procedure of an

agency on the one hand and, on the other hand, a regulation imposing substantive rights and obligations on persons or parties outside of the agency through the exercise of legislative power. In those cases examination of the impact, if any, of the regulation on the industry as a whole must be made.

The record before the ICC and the pleadings here (exclusive of affidavits filed by the parties in this court) demonstrate that the new regulations substantially eliminate the legal burden in effect for decades upon the shipper to learn the tariff rate by examining the tariff schedule in the ICC office or by going to an office of an agent of the carrier to examine it and shift the legal burden to the carrier to furnish the shipper at the shipper's request a copy of any proposed new or changed tariff schedules. Under the new regulations the shipper has been given a right, for a reasonable fee, to receive direct from the carrier a copy of a proposed new tariff or changed tariff prior to the date the tariff is to become effective. In addition, the shipper has been given the right to demand that he receive a copy of the tariff by a means faster than normally it would be delivered.

In their respective motions to the ICC for reconsideration of the subject regulations, the plaintiffs argued, as in this court, that the new regulations had a substantial impact upon their respective industries and that, therefore, § 553(b)(A) did not excuse noncompliance with the rulemaking requirements of Section 4 of the Administrative Procedure Act. Both the railroads and the freight forwarders asserted that a practical result of the regulations would be significantly increased payroll and other costs. The railroads contended that they could be put to a competitive disadvantage with certain other carriers by slowing the time within which they could raise or lower their tariff rates to meet competition and changing conditions. They alleged that there would be other adverse effects relating to the capacities of their printing facilities.

More detailed statements of the alleged substantial adverse impact were made by affidavits filed in this court in connection with the motion for summary judgment. For the purposes of this case, the court has not considered the aforesaid summary judgment affidavits. The court is of the view that the record before the ICC and the proposed regulations themselves establish sufficiently such an arguably substantial impact upon the industries as a whole as to require that the rulemaking procedures of § 553 be followed. Lewis-Mota v. Secretary of Labor, 469 F.2d 478 (2d Cir. 1972); Continental Oil Company v. Burns, 317 F.Supp. 194, 197 (D.Del. 1970); National Motor Freight Traffic Assn. v. United States, *supra*. We need not decide, therefore, the extent to which, if at all, it would be proper for this court to hear evidence upon, or make a factual finding of, the degree of impact upon the pertinent industries that the new regulations might have.

The court does not intend to convey any opinion on its part as to the wisdom or lack of it evidenced by the new regulations. That is a matter for the ICC ultimately to decide. We hold only that § 553 requires that the ICC may not act until affected parties are given appropriate notice and an opportunity to participate in the rulemaking through the submission of written data, views or arguments *before* the decision is made.

■ Defendants have also argued that the challenged order falls within the exception to § 553 set forth in § 553(b)(B). This paragraph exempts from the rulemaking procedure those rules for which ". . . notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." The ICC's initial order, dated May 1, 1972, made a specific finding that there was "an urgent need to establish regulations covering the transmission of tariffs, schedules, supplements and loose-leaf pages to subscribers and other interested parties. . . ." The May 1 order, incorporated by reference in the order of August

28, also stated that notice of proposed rulemaking ". . . is unnecessary since the new regulations represent a procedural reform." It is clear that the challenged order was not intended to fall within exception (B) to § 553(b). Exception B requires a statement in the rule that the ICC finds that notice and public procedures are impracticable, unnecessary or contrary to the public interest. While the above-mentioned statement in the May 1 order—that ·the rulemaking procedures were unnecessary since the regulations represent a procedural reform—may qualify as such a finding, there is no comparable language in either the May 1 or the August 28 order, other than the "procedural reform" reason, which might satisfy the requirement of exception (B) that a brief statement of the reasons for the finding be included in the order. Such a reason, of course, depends for its validity upon § 553(b)(A). Nothing in the official ICC record indicates that the ICC had any basis or reason for a finding of urgency relating to a means of distribution of tariff schedules which had been followed for years. But, in any event, the reason relied upon by the ICC in the May 1 order, and by reference in the August 28 order, for not adhering to the rulemaking procedures of the Administrative Procedure Act was that the matter was one of "procedural reform" exempted under § 553(b)(A). "[W]e must rely on the rationale adopted by the agency if we are to guarantee the integrity of the administrative process," Atchison, T. & S. F. R. Co. v. Wichita Bd. of Trade, 412 U.S. 800 at 807, 93 S. Ct. 2367, 2375, 37 L.Ed.2d 350 (1973), and the Commission cannot now rely upon an alternative argument that its procedure in handling this matter was justified under § 553(b)(B) if not under § 553(b)(A). Texaco, Inc. v. Federal Power Commission, 412 F.2d 740 (3rd Cir. 1969).

III. *Whether the plaintiffs were afforded the procedural requisites of the APA.*

Without prior publication in the *Federal Register* and without a general invitation to the industry as a whole to comment in advance, on May 1, 1972, the ICC issued an initial form of the order now in question. On June 7 and 8 respectively, representatives of the plaintiff railroads and the plaintiff freight forwarders filed petitions for reconsideration, alleging in both instances that the rulemaking provisions of the Administrative Procedure Act had not been followed and that, in any event, the ICC had no power under §̄ 6(6) to issue the new regulations. On June 13, 1972, the ICC stayed the order of May 1, pending disposition of the petitions for reconsideration filed by plaintiffs and others. On August 28, 1972, the ICC issued a new order, referring to the May 1, 1972 order and promulgating an expanded set of new regulations of the same general nature as were those contained in the prior order. Petitions for reconsideration were again filed by representatives of the plaintiff railroads and the plaintiff freight forwarders on the same grounds. On October 17, 1972, the ICC stayed the order of August 28 pending disposition ·of the new petitions for reconsideration. On November 20, Division 2 of the ICC, acting as an Appellate Division, denied the petitions for reconsideration and made the order of August 28 effective as of December 30, 1972.

The defendants argue that the initial May 1, 1972 order was in every respect a proposed order in that it was suspended or stayed for several months while the ICC considered petitions for reconsideration filed by the plaintiffs and others.

Petitions for reconsideration are handled under ICC rules by a division in an "appellate capacity," 49 C.F.R. § 1100.101(a)(3), and are not a vehicle for the introduction of new facts not already of record, 49 C.F.R. § 1100.101(d). Here there was no ICC record prior to the promulgation of the new regulations by the May 1 order. Under the ICC rules of procedure there was no opportunity for the plaintiffs to produce facts relating to the substantive merits of the regulations upon which they could then argue their wisdom or reasonableness.

1242

Without such an opportunity, the plaintiffs were deprived of an essential right granted to them by § 553 of the Administrative Procedure Act. The Supreme Court has said in *Allegheny-Ludlum, supra*, 406 U.S. at 758, 92 S.Ct. at 1951, that § 553 requires:

". . . basically that notice of proposed rulemaking shall be published in the Federal Register, that after notice the agency give interested persons an opportunity to participate in the rulemaking through appropriate submissions, and *after consideration of the record so made* the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. . . ." (Emphasis supplied).

The proceedings did not give the plaintiffs and other interested parties the required opportunity after notice to present facts for consideration by the ICC prior to the final substantive agency decision. See Wagner Electric Corporation v. Volpe, 466 F.2d 1013, 1020 (3rd Cir. 1972). The opportunity to present substantive facts and comments was not present here as it was in Amerada Petroleum Corp. v. F.P.C., 231 F.2d 461, 463 (10th Cir. 1956), and Owensboro v. United States, 104 U.S.App.D.C. 391, 262 F.2d 702, 708 (1958), cited by defendants.

 Finally, defendants contend that the ICC encouraged participation of all segments of the transportation industry prior to the promulgation of the May 1 order by:

1. Sending out letter questionnaires to some 185 motor carrier and rail carrier tariff publishing agents.

2. Considering the written submission of comments with respect to the questionnaires from both carriers and shippers.

3. Referring the matter to an advisory group composed of members of the Bureau of Tariffs of the ICC, a cross section of shipper representatives and experts from the motor and rail industries, which has as its purpose the rendering of advice to the ICC on tariff matters.

The ICC record, however, does not contain any reference to any investigations, questionnaires, proceedings, hearings, reports or any other matter prior to May 1, 1972. If there were such matters considered by the ICC as a result of the informal proceedings now identified, the record does not reflect it, which itself is a violation of administrative duty. Cf. Atchison, T. & S. F. R. Co. v. Wichita Bd. of Trade, *supra*, 412 U.S. at 807, 93 S.Ct. 2367, 37 L.Ed.2d 350; United States v. Allegheny-Ludlum Steel, *supra*, 406 U.S. at 749, 92 S.Ct. 1941, 32 L.Ed.2d 453. Nothing in the record demonstrates that any of the plaintiffs participated in the so-called informal proceedings and the freight forwarders categorically denied at argument in this court that they had any knowledge of it. In any event, the ICC's failure to comply with the rulemaking procedures of the Administrative Procedure Act cannot be cured or absolved by *post hoc* rationalizations of this kind. See Burlington Truck Lines v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

Although we believe the regulations to be within the power of the ICC to adopt and promulgate pursuant to 49 U.S.C. §§ 6(6) and 1005(b), we find that they were not adopted properly under the procedures required by 5 U.S.C. § 553. For that reason the regulations promulgated by the ICC order of August 28, 1972, are invalid, and the plaintiffs are entitled to a permanent injunction enjoining the enforcement of the same until such time, if ever, as they are validly adopted.

An order will be entered in accordance with the views expressed in this opinion.